UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

      -against-

                                  No. 18 Cr. 737 (JGK)

 KAM WONG,

               *Defendant.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X


# DEFENDANT KAM WONG'S
# MEMORANDUM IN AID OF SENTENCING


Jeffrey H. Lichtman, Esq.
Law Offices of Jeffrey Lichtman
11 East 44th Street, Ste. 501
New York, New York 10017
(212) 581-1001

Jonathan Savella, Esq.
810 Seventh Avenue, Ste. 620
New York, New York 10019
(646) 801-2184

*Attorneys for Kam Wong*

## TABLE OF CONTENTS

STATEMENT .................................................................................................................. 1

BACKGROUND AND CHARACTERISTICS ........................................................... 2

    I. EARLY LIFE .................................................................................................... 4

    II. ADULTHOOD ................................................................................................ 5

        a. Arrival in the U.S. .................................................................................. 5

        b. Career and Family ................................................................................ 7

        c. Decline into Addiction ....................................................................... 10

OFFENSE CONDUCT ............................................................................................ 12

POST-ARREST CONDUCT ................................................................................... 13

    I. Acceptance of Responsibility and Recovery ........................................... 13

    II. Unfounded Claims of Asset "Dissipation" ........................................... 14

ADVISORY GUIDELINES CALCULATION ..................................................... 16

SENTENCING CONSIDERATIONS ................................................................... 18

CONCLUSION ......................................................................................................... 23

## STATEMENT

For the first three decades of his long career, Kam Wong devoted his waking hours to the growth and protection of the institution that employed him. At his desk for six days a week, every week, year after year, Mr. Wong surmounted cultural and linguistic barriers, advancing, slowly but steadily, from one stratum of the corporate hierarchy to the next. On his 53rd birthday in 2008, Mr. Wong stood at the summit of a brilliant career, the CEO of New York City's largest credit union and a living affirmation of our Country's most cherished aspirations.

By his 63rd birthday, Mr. Wong had become a walking testament to human frailty and the dangers of unchecked addiction. Over the course of a few years, he traded everything he had earned – including his good name and hard-won financial security – for a pile of lottery tickets. On June 4, 2019, Mr. Wong will appear before this Court for sentencing on his embezzlement conviction. He submits this memorandum, together with the attached letters, in support of his request for leniency.

## BACKGROUND AND CHARACTERISTICS

"Kam" lives in the small, ticky-tacky Long Island ranch he and his wife, Ruby, purchased together in 1989. The house, situated in a working-class neighborhood, is compact, neatly kept and utterly unpretentious. The two sons that Kam and Ruby raised in it, Edward (age 36) and Kevin (age 30), live nearby and visit frequently. Ruby credits her husband for teaching his children – both college graduates with careers, wives and young children of their own – "the value of good education and goodness of heart." Ltr. from Ruby Wong (Feb. 25, 2019).[1]

Edward and Kevin have been devastated by the past year's revelations about their father. Edward, an investment banker who had once cherished the idea that working in finance made him "just like" his "role model and hero," now describes his father's career as "lost years." Ltr. from Edward Wong (March 10, 2019). Kevin is overcome with conflicting feelings of anger, pity, guilt and sadness when he confronts the man who, before "May [] 2018," had been his "idol." Ltr. from Kevin Wong (undated).

The bewilderment and grief of Kam's sons are echoed in dozens of letters from the Wong family and their friends. Kam's daughter-in-law, Shu Lin, agonizes between her view that people "should [] be held to the consequences of [their] actions" and her

---

[1]     Support letters from dozens of Kam's family members and friends are attached to this Memorandum as Appendix A.

deep affection for Kam, whom she describes as "one of the best people" she knows. Ltr. from Shu Lin (March 10, 2019). Ms. Lin writes that Kam

> is a family man in the truest sense of the word; not only does he give all of himself to see his family happy, but he never expects anything in return. He is the hardest person to shop for during the holidays because he is content with the same worn down khakis and Rockport shoes he's had for years. He is the one who probably won't ask how you are doing, but will be the first in line should you ever need help. He is the one who used to text me at the beginning of every week during my difficult pregnancy to confirm my prenatal appointments and make sure I had transportation scheduled. He is now one of only three people, besides my husband and me, [] whom my daughter will allow to hold her.

*Id.*

Ruby's sister, Cecilia Moy Marin, writes that she is "forever grateful" to Kam for "step[ping] in" financially when a divorce and mounting debt jeopardized her ability "to make ends meet" and "provide a stable home life for [her] son." Ltr. from Cecilia Moy Marin (Jan. 15, 2019). Kam's support was not, however, limited to money. He also opened his home and his heart to Ms. Moy Marin's boy. Kam, she says, has been

> a huge influence in my son's life. Since the separation, my son did not have a strong male role model in the house. I believe that Kam provided that role in his life. Without Kam's guidance my son would have had no support from a "Father Figure."

*Id.*

Andrew Moy Marin confirms his mother's assessment and provides a moving tribute to the uncle "who has always been [like] a father" to him. Ltr. from Andrew Moy Marin (Jan. 15, 2019). He recalls:

3

> [During] my 4th year at University of Central Florida[, when] I had not been doing well in school[] and . . . [was] unable to support myself, I found out that my girlfriend and I were going to have a baby.  I felt like my life was collapsing. Creditors were calling and threatening me on a daily basis, and I had exhausted my finances and could not pay for rent or books. At this time of need I found myself calling Kam for help . . . . [H]e was the only person I trusted to understand my situation.

*Id.*  Today, Andrew credits Kam's "help and guidance" for getting him "back on [his] feet." *Id.* He has since graduated from college and built a "successful career and an amazing family life with [his] wife and 3 children." *Id.*

In addition to serving as the loving patriarch of his family, Kam is also a pillar of the Chinese-American community. Mun-Tin Tam writes that Kam "encourage[s, ] comforts" and

> supports our neighborhood's new immigrants in many ways, helping them find jobs and settle down, helping translate for parents who had difficulty communicating with schools; several times he rushed bringing kids in the community for urgent medical care.

Ltr. from Mun-Ting Tam (March 11, 2019).

More than kind, the man who emerges from the support letters is *devoted* to the people around him. Kam's capacity for devotion – and the relentless energy he brings to his endeavors – was the defining characteristic of the first five decades of his life.

## I.    EARLY LIFE

In the late 1940s, Kam's maternal grandfather fled the communist takeover of mainland China, moving with his wife and children to Hong Kong. It was there that his teenage daughter, Payhai Gong, became romantically involved with a local bricklayer

named Sang Wong. Defying the wishes of her disapproving family, Payhai eloped with Sang in 1955. A few months later, she gave birth to Kam.

Without support from Payhai's parents – they moved to the United States in the 1960s, leaving their estranged daughter and her husband to fend for themselves –  the Wongs were poor even by Hong Kong's standards. Making due with a 400 square foot subsidized apartment, Payhai and Sang struggled to feed their growing family.

Kam spent his entire childhood in these modest circumstances, attending school on a pittance from his grandparents and ensuring that each of his five siblings received a fair share of the family's scarce resources. One of his brothers, Kam Shing Wong, recalls that as "the oldest, [Kam] had the most responsibilities" and was expected to "watch his younger brothers and sister and help out with chores." Ltr. from Kam Shing Wong (Feb. 28, 2019).

After his graduation from high school in 1973, Kam went to work as a clerk for an importing firm. Two years later, his family received permission to join Payhai's parents and sibling in New York City.  Kam – 19 years old and reasonably content with his lot – agreed to join them on one condition: that he be permitted to pursue a college education.

## II.   ADULTHOOD

### a.   Arrival in the U.S.

On May 9, 1975, the entire Wong family – Payhai, Sang, Kam and his five younger siblings – moved into the Gong's three-bedroom apartment in the Flatbush

neighborhood of Brooklyn. For Kam and his siblings – who had never had hot running water in their home – Flatbush seemed like the lap of luxury.

Within days of his arrival in the United States, Kam had secured a job waiting tables in a Chinese restaurant. As the only member of his family who spoke even rudimentary English,  he also took it upon himself to enroll his school-aged siblings in school. As soon as he had his brothers and sister situated, Kam made arrangements for his own education. In September 1975, he became the first member of his extended family to attend college.

For six arduous years – four at Bronx Community College and two at Baruch College in Manhattan – Kam shuttled between classes, the restaurant jobs that "help[ed his] parents make ends meet" and the Wong's crowded "one-bedroom apartment in Brooklyn." Ltr. from Ming Wong (Feb. 26, 2019). At home, Kam was an "overprotective big brother" to his five siblings and numerous cousins. Ltr. from Karen Wong (Jan. 16, 2019). One of Kam's cousins remembers that

> [t]here was huge responsibility [] on Kam to care for his mother and younger siblings, while his father was working night [and] day . . . in a restaurant to support the family. Kam made sure there was no fighting, homework and chores were done, and constantly remind[ed] me and my cousins to stay out of trouble.

Ltr. from Gregory Gong (Jan. 16, 2019).

In light of his many duties and obligations, Kam's commitment to academic goals was nothing short of remarkable. Kam Shing Wong confirms that

> even with so much to do, [Kam] never slacked off his schoolwork.
> Doing well at school was very important to him. He used to hide in
> the bathroom late at night so he [could] study. It was the only room
> in the house that had some privacy. [Kam] believed in hard work and
> encouraged us to do the same.

Ltr. from Kam Shing Wong.

In 1981, Kam emerged from Baruch with a bachelor's degree in accounting. The

next phase of his life would begin before his graduation cap landed

### b.    Career and Family

During his studies at Bronx C.C., Kam had fallen in love with a classmate, Ruby

Moy. Although Kam and Ruby married in 1979, they had put off cohabitation for

financial reasons. Ruby "vividly" remembers that on one evening early in her marriage

to Kam,

> we only had one dollar to spend for the day before our next paycheck
> came in. We [could] only afford to buy one McDonald's burger to
> share. After that experience, my husband told me that it would never
> happen again. He promised that he would work hard and provide
> me with a stable life[.]

Ltr. from Ruby Wong.  Upon his graduation from Baruch, Kam moved his wife into a

new apartment in the Midwood area of Brooklyn. Ruby gave birth to Kam's first son,

Edward, in August of the following year.

No stranger to responsibility, Kam made the transition from student to husband

and father with characteristic alacrity. In September 1981, he embarked upon his

lengthy career at the Municipal Credit Union ("MCU"), accepting an entry-level

accounting position at the organization's headquarters, adjacent to the World Trade Center in lower Manhattan.

Kam spent the remainder of his 20s at work to support his young family, supplementing his modest salary from MCU with weekend shifts at various restaurants. In due course, Kam achieved the economic security that he had promised his wife. Starting from scratch, the Wongs had transformed themselves into home-owning members of the middleclass by the end of the 1980s.

The family's rising fortunes resulted, in large part, from Kam's relentless determination to succeed at MCU. From the early days of his employment there and for years after his promotion to CEO in 2007, Kam opened the credit union's offices in the morning and closed them at night, usually spending six days of every week at his desk. His eldest remembers that

> As a child, I never really got to spend much time with my father, though I knew he cared greatly about me and my brother. He was never around much because he was working so hard to try and improve our lives – leaving for work at 5am and returning home at 8pm every day for nearly 20 years. Coming from an impoverished family, he provided for us while never letting us know what a burden and hardship he was taking on. He never wanted us to worry.

Ltr. from Edward Wong.

Long hours were, however, not the only way that Kam distinguished himself from his colleagues. Kam also possesses a special gift for management, especially in times of crisis and rapid change. In the words of one of his wife's sisters, Kam is "a natural leader." Ltr. from Diana Loria (Feb. 7, 2019).

Kam emerged as one of the MCU's leaders in the late 1980s, as the savings and loan debacle exposed small and medium-sized financial institutions to increasing regulatory oversight. A low-level supervisor in the accounting department when the crisis broke, Kam spearheaded the modernization of the credit union's accounting practices. The success of his efforts resulted in his promotion to Chief Financial Officer in 1989.

Remaining CFO until 2006, Kam presided over MCU's finances during a period of transformative growth. Clamping down on the unbridled economic optimism of the time, he managed to keep the rapidly expanding credit union on a solid financial footing. He also prepared the organization for the future, overseeing the transition to a "Y2K-compliant" computer system that would record account transactions to a mainframe at MCU's Cortlandt Street headquarters.

Kam's finest hour as an executive began on the darkest day in our nation's history. Although the building that housed the credit union's headquarters survived the morning of September 11, 2001, it was without power for weeks after the attacks. When MCU's mainframe went dark, the credit union was pitched into an existential crisis.

Kam, who had been in his office when the planes struck, dragged the teetering institution back to its feet. His first order of business was convincing his colleagues to continue banking operations, blindly honoring withdrawal requests until access to the mainframe's account database could be restored. Unpalatable though this course was

to any banker, Kam argued that it was preferable to the panic that the credit union would trigger if it suspended withdrawals altogether.

When MCU's branches opened for business on September 13, Kam was already working furiously to establish a temporary headquarters and deploy a replacement mainframe. When, four tireless weeks later, the credit union's new computer system blinked to life, Kam switched gears. Over the next year, he led the organization's campaign to claw back nearly $60 million in overdrafts from the blackout period. When he was finished, nearly all of the money had been returned.

Kam's leadership in the aftermath of 9/11 propelled him to the final step in his already brilliant career. In 2004, MCU's Board tapped him as the organization's next CEO. After a prolonged transition, he assumed control of the credit union in February 2007.

### c.    Decline into Addiction

The timing of Kam's ascent to the CEO's office was, perhaps, inauspicious. During the first several years of his tenure, he carried MCU through a succession of disasters that included the subprime lending crash, the deepest financial crisis of the century, the great recession and the sudden economic downturn resulting from Superstorm Sandy. Outwardly, Kam met each of these challenges with his customary

sangfroid. Inwardly, however, the years of stress and toil had been chipping away at his mental wellbeing.

Kam began playing the lottery in 2001. During those early days, his weekly expenditure of $1 or $2 on "Win4" tickets served as a brief distraction for a busy man who lacked conventional hobbies. As Kam's work responsibilities grew, so did his appetite for the tickets. During the stressful period following the September 11 attacks, for instance, Kam's lottery expenditures spiked to $10 or $20 per week.

Over time, Kam's "hobby" blossomed into a malignant fixation. He lost control. Around the time of his promotion to CEO in 2007, Kam bought $100 worth of Win4 tickets every day, playing various combinations of his 10 favorite numbers. He began to have nightmares about the lottery, dreaming that his numbers came up in the one drawing he had neglected to enter. Desperate to prevent such a catastrophe in real life, he began phoning-in ticket purchases when other commitments kept him away from the convenience store.

As his daily lottery expenditures climbed into the triple digits, Kam sought out new and more creative ways of financing his habit. The challenge, at least initially, was not that he lacked sufficient wealth – as CEO, his average yearly income topped a million dollars – but his wife. Ruby, nominally in charge of the family finances and totally ignorant of her husband's addiction (ltr. from Ruby Wong), would notice if

"$60,000" – roughly the purchase price of a new Mercedes – were disappearing from the joint account every month. PSR ¶ 89.

To keep Ruby in the dark, Kam started funneling his money into the lottery through backchannels. He found convenience stores that would permit him to buy lottery tickets on credit, then diverted a chunk of his yearly bonus – and any other income his wife would not miss – to pay down the enormous balances that he generated. When the money Kam skimmed from his own earnings was no longer enough to support his ravenous addiction to the lottery, he began stealing money from the organization he had served faithfully for over 30 years. *See* **OFFENSE CONDUCT**, *infra*.

At the feverish peak of his gambling addiction, which extended from 2013 through 2017, Kam relied on prescription painkillers to subdue his conscience. With help from his dentist and a crooked member of MCU's Supervisory Committee, he put himself on a daily regimen of judgment-suppressing opiates, popping hydrocodone pills and sipping from a bottle of codeine-laced syrup at his desk. PSR ¶¶ 43, 93-96. During this period, Kam spent at least $5.5 million – $3.5 million in personal checks and nearly $2 million in ATM withdrawals – on lotto tickets. PSR ¶ 37. The better part of this fortune – approximately $4.5 million – Kam stole from MCU.

## OFFENSE CONDUCT

Following a car accident in 2011, Kam submitted a claim to MCU for reimbursement of $25,000 in repairs to his work vehicle. PSR ¶ 31. When insurance

covered the mechanic's bill, he kept MCU's money. *Id.* Beginning with this first act of dishonesty, the scale and frequency of his deceptions increased, keeping pace with his burgeoning gambling debts. *See* PSR ¶¶ 10-44. When questionable expenditures and MCU's tax liabilities are added to the roughly $4.5 million that Kam put directly into his own pockets, the depredations caused the credit union to suffer nearly $10 million in losses.

At some point in 2017, the government opened an investigation into Kam's misconduct. At an interview with investigators in January 2018, Kam, who was not represented by counsel at the time, denied that he had unlawfully obtained money from MCU. Soon after the interview, he obtained false statements concerning his compensation from several former MCU Board members.

## POST-ARREST CONDUCT

### I.      Acceptance of Responsibility and Recovery

By the time the agents arrived at his house with an arrest warrant in May 2018, Mr. Wong was prepared to take full responsibility for his conduct. He did just that, entering into a plea agreement and pleading guilty to embezzlement. He also consented to a forfeiture judgment in the amount of MCU's total losses of over $9.5 million, notwithstanding the fact that his personal share of the offense proceeds – *i.e.*, the roughly $4.5 million that Mr. Wong stole for himself – had been converted into lottery tickets and lost. The approximately $4 million in "substitute assets" that the government has seized from the Wongs over the past several months represents virtually every

penny that the couple had saved during the 40 years of their marriage. *See* 3/8/19 Forfeiture Mot., ECF No. 26.

Within days of his arrest, Mr. Wong sought out treatment for his gambling addiction. He currently attends regular "group" and "individual" therapy sessions conducted under the auspices of the New York State Council on Problem Gambling. Ltr. from Veronica Hemming LCSW-R, CASAC (Feb. 25, 2019). Mr. Wong's therapist describes him as "actively engaged in the process" of recovery. Ltr. from Veronica Hemming LCSW-R, CASAC (Feb. 25, 2019).

## II.   Unfounded Claims of Asset "Dissipation"

The prosecution has repeatedly claimed that the Wongs engaged in an effort to "dissipate assets" and "avoid . . . criminal forfeiture." 3/8/19 Forfeiture Mot., ECF No. 26, at 7; *see also* 5/7/19 Gov't ltr., ECF No. 39, at 2 (accusing Mr. Wong of taking "action to dissipate or seek to conceal assets from the government"). That allegation is patently false.

Within weeks of Mr. Wong's arrest in May 2018, Citibank decided to close the Wongs' longstanding joint accounts. Reasoning that the arrest had prompted the Citibank termination, Mrs. Wong became concerned that any bank account in her husband's name would meet the same fate. After consultation with Mr. Wong's counsel – and well before the parties entered into a plea agreement – the couple transferred the Citibank account balances to new TD Bank accounts held exclusively in Mrs. Wong's name.

The Wongs made no attempt to hide the TD Bank accounts – or the provenance of the money they contained – from the government. To the contrary, Mr. Wong identified the accounts in his pre-sentence disclosures to the Probation Department, "report[ing]" that "he [had] deposited the funds into" them.[2] PSR ¶ 111. Upon the draft PSR's release in late January 2019, the government objected that Mr. Wong had not declared the joint Citibank accounts.[3] In response, Mr. Wong's counsel produced copies of Citibank's account closure notices along with an explanation of the circumstances surrounding the Wongs' move to TD Bank. In subsequent conversations, counsel

---

[2]     A redacted copy of the relevant portion of Mr. Wong's financial disclosure is attached to this Memorandum as Appendix B.

[3]     In objections submitted to the Probation Officer, the government proposed adding the following paragraphs to the final PSR:

> WONG's lists of assets in his financial affidavit does not list include at least four Citibank accounts that were jointly in his name and his wife's. On or about shortly before his arrest, these accounts collectively had over $1 million on deposit.
> . . . .
>
> Although WONG does not identify the "approximately eight bank accounts with a combined total balance of $793,777.01" for which "he does not have access," despite having "deposited the funds into these accounts," based on the Government's investigation, the Government is not aware of accounts with this amount of money for which WONG was not a signatory. It appears these accounts may in part be a reference to the four Citibank accounts that WONG did not include on his affidavit's list of assets, even though they were joint accounts in his and his wife's name.

1/31/19 Gov't ltr. to the USPO 4.

assured the government that the Wongs had no intention of opposing forfeiture of the TD Bank accounts on the basis that only Mrs. Wong's name appeared on them.[4]

The transparency of the Mr. Wong's financial disclosures, coupled with his forthright responses to inquiries concerning the Citibank accounts, made it abundantly obvious that the Wongs had not "purposely dissipated assets . . . to avoid an anticipated criminal forfeiture order." 3/8/19 Forfeiture Mot. at 7. The prosecutors' assertions to the contrary were not only false, they were deliberately misleading.

## ADVISORY GUIDELINES CALCULATION

Mr. Wong's plea agreement sets forth the following Guidelines calculation:

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(1)): | 7 |
| Loss or intended loss between $9, 500,000 to $25,000,000 (§ 2B1.1(b)(1)(K)): | +20 |
| Abuse of trust enhancement  (§ 3B1.3): | +2 |
| Obstruction enhancement (§ 3C1.1): | +2 |
| Acceptance of responsibility (§ 3E1.1(a)-(b)): | -3 |

The resulting adjusted offense level of 28 corresponds to an advisory Guidelines range of 78-97 months in criminal history category I.  Mr. Wong makes no objection to this calculation.

---

[4]     This concession could hardly have come as a surprise to the prosecutors. After all, Mr. Wong's representations to the Probation Officer (*see* PSR ¶ 111) all but precluded Mrs. Wong from claiming exclusive ownership of the TD Bank accounts.

He does, however, object to the Probation Department's addition of two additional offense levels for "deriv[ing] more than $1,000,000 in gross receipts from one or more financial institutions." PSR ¶ 55; *see* U.S.S.G. § 2B1.1(b)(17)(A). Implemented "in the wake of the savings and loans crisis" of the 1980s, the "gross receipts" enhancement targets offenders who exploit weaknesses in the banking and financial systems for criminal ends. *U.S. v. Ferrarini*, 219 F.3d 145, 159-63 (2d Cir. 2000); *see U.S. v. Goldstein*, 442 F.3d 777, 779-81, 785-86 (2d Cir. 2006) (applying the enhancement to defendant who profited from the use of stolen banking and credit card information); *U.S. v. Khedr*, 343 F.3d 96, 101 (2d Cir. 2003) (holding that an earlier version of the § 2B1.1(b)(17)(A) enhancement applied to a defendant "responsible for borrowing $1,780,000 in phony auto loans"); *Ramzan v. U.S.*, No. 06-cr-456, 2012 WL 3188847, at *2-*3 (S.D.N.Y. August 6, 2012) (noting that gross receipts enhancement applied to defendant who "conspired to defraud mortgage lenders by arranging for 'straw purchasers' to receive loans from the lenders under false pretense").

The plea agreement in this case reflects the parties' reasoned judgment that Mr. Wong's offense – stealing money from his employer – falls outside of § 2B1.1(b)(17)(A)'s ambit. The Court should exercise its discretion to uphold the terms of Mr. Wong's plea agreement. *C.f. United States v. Salcido-Contreras*, 990 F.2d 51, 53 (2d Cir. 1993) (failing to give effect to provisions of a valid plea agreement "would render the plea bargaining process . . . meaningless").

## SENTENCING CONSIDERATIONS

Mr. Wong stole millions of dollars from his employer and, in doing so, deceived and betrayed every person that trusted him, including MCU's depositors, colleagues that had worked beside him for decades and his wife. He is acutely aware that he deserves punishment. In an interview with the Probation Officer, Mrs. Wong characterized her husband as "depressed [and] emotional" since his arrest, adding that he had occasionally "expressed" what she called "suicidal thoughts." PSR ¶ 78. Mr. Wong has acknowledged that he "contemplated" ending his life with a fatal dose of medication but "threw away the pills" after considering the impact that his death would have on his family. *See* Rosenthal Eval. 4.[5]

Accounts from members of the Wong family further illustrate the depths of Mr. Wong's remorse and shame.[6] Kam Shing Wong writes that his brother's arrest and prosecution:

> has been [] very difficult [] for our family. We have accepted what [Kam] has done but we are keeping it from our Mother. She is 83

---

[5]     In August 2018, Fordham University psychology professor Barry Rosenfeld conducted a clinical psychological evaluation of Mr. Wong. Citations to "Rosenfeld Eval." refer to the written report of Professor Rosenfeld's findings, which are attached to this Memorandum as Appendix C.

[6]     *See, e.g.*, ltr. from Virginia Chiu ("I know my brother regrets his actions and feels great shame."); ltr. from Tina Szeto (Feb. 9, 2019) ("Kam is very remorseful and ashamed that he broke the trust of the public[.]"); ltr. from Adelaide Gong (Jan. 20, 2019) ("Kam understands that he has done wrong and expresses regret and remorse for his actions.").

> years old and ha[s] been so proud of [Kam]. If she knew what he has
> done, it would break her mentally and physically.

Ltr. from Kam Shing Wong.

A "just punishment" in this case must account for the enormous trust that Mr. Wong violated through his conduct. 18 U.S.C. § 3553(2)(A).  It must also account for *how* Mr. Wong earned that trust and the circumstances under which he abrogated it. For more than 50 years, Mr. Wong led a life of probity and responsibility. He pulled himself up from poverty, worked his way through college and climbed to the top of his chosen profession. Along the way, he built a family that continues to love and support him even in the midst of his life's darkest chapter. These were not the exertions of a conman.

Nor do surmises concerning greed and self-entitlement provide a sensible explanation for Mr. Wong's offense. Avarice and entitlement are rational sentiments. Mr. Wong's conduct – risking his reputation and freedom to pour *millions of dollars* into a lottery game with 1:10,000 odds and a maximum prize of $5,000[7] – was utterly irrational. As Judge Rakoff observed at sentencing in *United States v. Caspersen*, No. 16-cr-414, there is a "fundamental moral" distinction between

> people who commit crimes because they have made a rational choice
> . . . [to] do something antisocial and harmful to others in order to
> gain [] material benefits . . . and those who act with diminished
> capacity and who are to some degree not acting with a full deck.

Sentencing Tr. 46-47 (S.D.N.Y. Nov. 4, 2016).

---

[7]     *See Win 4 Draw Game – Game Odds and Prizes*, New York Lottery, https://nylottery.ny.gov/win-4 (last visited May 1, 2019).

Psychologist Barry Rosenfeld has identified Mr. Wong's insidious and compulsive behavior as the manifestation of a "severe gambling disorder." Rosenfeld Evaluation at 5. Clinical descriptions of the disorder warn that a "pathological" gambler

(1) is preoccupied with gambling . . .

(2) needs to gamble with increasing amounts of money in order to achieve the desired excitement

(3) has repeated unsuccessful efforts to control, cut back, or stop gambling

. . .

(5) gambles as a way of escaping from problems or of relieving a dysphoric mood (e.g., feelings of helplessness, guilt, anxiety, depression)

(6) after losing money gambling, often returns another day to get even . . .

(7) lies to family members, therapists, or others to conceal the extent of involvement with gambling

(8) has committed illegal acts such as forgery, fraud, theft, or embezzlement to finance gambling

(9) has jeopardized or lost a significant relationship, job, or educational or career opportunity because of gambling

(10) relies on others to provide money to relieve a desperate financial situation caused by gambling

Darren Gowen and Jerri B. Speyerer, *Compulsive Gambling and the Criminal Offender: A Treatment and Supervision Approach*, 59 Fed. Probation 36 (Sept. 1995). These symptom read like a summary of Mr. Wong's life during the years preceding his arrest.

Mr. Wong's addiction was particularly destructive because it emerged late in his life and at the apex of his professional responsibilities. In his evaluation, Professor

Rosenfeld observes that Mr. Wong's "lottery fixation" started out as "[the subject's] primary coping strategy, serving as both a social outlet . . . . and a means of distracting him from the stressors associated with his work." Rosenthal Evaluation at 5. The Professor concludes that during "the several years leading up to his arrest," Mr. Wong "lost control over his addiction." *Id.*

Gambling addiction does not excuse Mr. Wong's actions, but it does place them into context. A serious gambling disorder is functionally "similar" to narcotics dependence, diminishing the subject's "capacity to evaluate and control his [ ] behaviors . . . [and] accurately weigh[] future consequences." *United States v. Dikiara*, 50 F. Supp. 3d 1029, 1032 (E.D. Wis. 2014); *see* C. Holden, *Behavior Addiction Debut in Proposed DSM-V*, SCIENCE, Feb. 2010 at 935 (discussing brain-imaging studies that demonstrate "important similarities" between the neurological responses of "problem gamblers[]" exposed to gambling images and a "cocaine addicts [] viewing a video about cocaine"). As the disease progresses, problem gamblers "common[ly]" turn to offenses like "[f]orgery, theft and embezzlement." Gowen & Speyerer, *supra*.

Not surprisingly then, courts have recognized that acute disorders like the one that afflicted Mr. Wong significantly "mitigate a defendant's culpability." *Dikiara*, 50. F. Supp. 3d at 1032. In *Dikiara*, for instance, the defendant "[u]sed her position as [a small business's] office manager" to steal more than "$1,000,000 from her employer" over the course of 11 years. *Id.* at 1030. She "gambled away virtually all of the proceeds of her crime" at a local casino. *Id.* at 1030. Despite a guidelines range of 41-51 months, the

court imposed a sentence of just over one year, citing the defendant's "gambling addiction," post-arrest "efforts to obtain treatment" and "lack of any prior record" as the primary bases for the variance. *Id.* at 1033-34.

Even more recent and much closer to home is *United States v. Caspersen.* The defendant in that case engaged in a "Ponzi-like scheme" that bilked "more than a dozen" victims – many of them individual investors – of "approximately $38.5 million." 10/26/16 Gov't Sentencing Mem. 1-2, *Caspersen*, ECF No. 32. At sentencing, it emerged that the defendant had stolen the money to feed his "pathological" addiction to high-risk stock trading. 10/21/16 Def. Sentencing Mem. 1, *Caspersen*, ECF No. 29. Concluding that the guidelines range of 151-188 months failed to account for the "serious[] impact[]" that the "gambling disorder" had on the defendant's ability to "exercise [] rational control and [] decision making," Judge Rakoff imposed a 48-month sentence. Sentencing Tr. 81-82, *Caspersen*, ECF No. 37.[8]

---

[8]      Defendants regularly receive significantly below-guidelines sentences for offenses that are comparable to Mr. Wong's, even when their conduct was motivated by ordinary greed. In *United States v. Beckish*, No. 17-cr-569 (ER) (S.D.N.Y.), for example, lead defendants James Beckish and Anthony DeMaria pleaded guilty to stealing over $7 million from the victims of their credit card scam. After receiving a number of guidelines enhancements, including 4-level bumps for acting as "organizer[s and] leader[s]" (*see* U.S.S.G. § 3B1.1(a)), Beckish and DeMaria both faced a guidelines range of 87-108 months. *See* Gov't Sentencing Memorandums, *Beckish*, ECF Nos. 159-60. In April of this year, Judge Ramos sentenced Beckish and DeMaria to 48 months and 36 months, respectively.

*Dikiara* and *Caspersen* are particularly instructive. In both cases, law-abiding and productive individuals resorted to deceit and theft to feed gambling addictions. In both cases, the courts saw fit to temper justice with mercy, handing down sentences that varied significantly from the advisory guidelines range. The defense respectfully requests similar treatment for Mr. Wong. *See United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008) (Section 3553(a) emphasizes "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

## CONCLUSION

Mr. Wong worked diligently for 40 years to earn a place in the world, building a successful career, a sterling reputation and a comfortable lifestyle for his family. As a result of his offense, he has been stripped of these achievements and the self-respect that went with them. At 64, these comforts are permanently lost to him. Mr. Wong's disgrace and humiliation are sufficiently comprehensive to render questions of "deterrence and protection of the public" academic. *United States v. Steward*, 590 F.3d 93, 141 (2d Cir. 2009).

While Mr. Wong must be punished further, the imposition of a lengthy prison term at this point will not meaningfully advance the ends of sentencing. It would, however, devastate Ruby Wong and the other innocent members of the Wong family. For their sake as well as his own, Mr. Wong begs the Court for leniency.

Dated:      New York, New York
            May 13, 2019

Respectfully submitted,


_____/s/_____
Jeffrey H. Lichtman, Esq.
Law Offices of Jeffrey Lichtman
11 East 44th Street, Ste. 501
New York, New York 10017
(212) 581-1001
jhl@jeffreylichtman.com

Jonathan Savella, Esq.
810 Seventh Avenue, Ste. 620
New York, New York 10019
(646) 801-2184
jonathan.savella@gmail.com

*Attorneys for Kam Wong*

# APPENDIX A

## <u>SUPPORT LETTER INDEX</u>

**Mr. Wong's Wife and Children**                                          **SL**

Ltr. from Ruby Wong (Feb. 25, 2019)……………………………………...   1

Ltr. from Edward Wong (March 10, 2019)…………………………………   3

Ltr. From Kevin Wong (undated)…...…………………………………...   5

Ltr. from Shu Lin (March 10, 2019) …...…………………………………...   9

**Mr. Wong's Siblings**

Ltr. from Tin Yau Chiu (Feb. 2, 2019) …...…………………………….....   10

Ltr. from Virginia Chiu (Feb. 2, 2019) …...…………………………………   11

Ltr. from Diana Loria (Feb. 7, 2019) …...…………………………………...   12

Ltr. from Cecilia Moy Marin (Jan. 15, 2019) …...…………………………...   14

Ltr. from Rosanna Moy (Feb. 7, 2019) …...…………………………………...   15

Ltr. from Tina Szeto (Feb. 9, 2019) …...…………………………………...   16

Ltr. from Mun-Ting Tam (March 11, 2019) …...…………………………...   17

Ltr. from Alan Kam Fai Wong (Feb. 9, 2019) …...…………………………...   18

Ltr. from Kam Shing Wong (Feb. 28, 2019) …...…………………………...   19

Ltr. from Karen Wong (Jan. 16, 2019) …...…………………………………...   20

Ltr. from Ming Wong (Feb. 26, 2019) …...…………………………………...   21

Ltr. from Sau Kelly and Kam-Kueng Wong (March 10, 2019)…………...   22

**Mr. Wong's Cousins**

Ltr. from Adelaide Gong (Jan. 20, 2019) …...…………………………………...   23

Ltr. from Greg Gong (Jan. 16, 2019) …...…………………………………...   25

Ltr. from Tiphanie Gong (Feb. 23, 2019) …...…………………………………...   27

Ltr. from Ernest Gong (Jan. 10, 2019) …...……………………………... 28

**Mr. Wong's Nieces and Nephews**

Ltr. from Melissa Chiu (March 12, 2019)……………………………….. 29

Ltr. from Ashley Chung (Feb. 15, 2019)………………………………… 30

Ltr. from Caravaggio Loria (undated) …...……………………………… 31

Ltr. from Gavriel Loria (Feb. 7, 2019)………………………………….... 32

Ltr. from Andrew Moy Marin (Jan. 15, 2019) …...……………………… 33

Ltr. from Evelyn Wah (Jan 13, 2019) …...……………………………… 35

**Wong Family Friends and Neighbors**

Ltr. from Kenneth Gallagher (undated) …...…………………………….. 37

Ltr. from Maxmillan Gallagher (undated) …...…………………………... 38

Ltr. from Dr. Joseph Lyden (Jan. 30, 2019) …...………………………… 39

Ltr. from Ivy Lynden (Jan 20, 2019) …...……………………… 41

Ltr. from Charles Rodriguez (Jan. 31, 2019) …...……………………….. 43

Ltr. from Melissa Suen (Feb. 10, 2019) …...……………………………... 44

**Other Acquaintances of Mr. Wong**

Ltr. from Veronica Hemmings LCSW-R, CASAC (Feb. 24, 2019)………. 45

Ltr. from Scott Meyer (March 1, 2019) …...……………………………… 46

February 25, 2019

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Koeltl:

I am writing to you on behalf of my husband, Kam Wong, who has pleaded guilty for embezzlement and will appear before you on April 5, 2019 for sentencing. I have known Kam for 43 years and married to him for 40. To me to others who have known him, he is a loving, caring, devoted, responsible husband, father, grandfather, son.

Kam came from a low income, middle class family with five younger siblings. His family immigrated to the United States in 1975. Due to his parents having only a third grade education, they were only able to get low paying jobs to support the family. Since Kam was the eldest of all the children, he had to take on the responsibility of caring for his siblings while his parents struggled to make ends meet. He made sure his brothers and sister stayed on track with their education while staying out of trouble with gangs, which were very popular at the time. I met Kam when we both were attending Bronx Community College in 1976. Since both of us did not come from a well to do family, we both had to work on weekends in order to have spending money through out college years. I remember vividly one of many incidents that we both faced when we were struggling financially, we only had one dollar to spend for the day before our next paycheck came in. We can only afford to buy one McDonald's burger to share. After that experience, my husband told me that it would never happen again. He promised that he would work hard and provide me with a stable life in which he did. At that point I knew he was a good hearted and responsible person. After he graduated from Baruch College, we got married right away and he worked in a company, the same company for the next 37 years. Initially, besides working full time with that company, going part time schooling to further his education, he also had a second job as a waiter on the weekends to provide a better life for both of us and eventually for our two sons as well. Kam is a

caring and loving father. He provided the best he could to his two sons, age 36 and 30, married and fathers to three beautiful granddaughters now. He has tried to be a good role model to them by showing them that one must work hard in order to achieve their goal in life. He has instilled the value of a good education and goodness of heart in them so that they can contribute to society which they did achieve.

As his position progressed in the company, he was no longer able to hold a second job. However, long working hours were still required of him. Even though our financial situation got better, we had other issues to content with. I was diagnosed with Rheumatoid Arthritis ten years ago, and my oldest son was diagnosed with Lupus five years ago. Besides dealing with our health issues and family problems, Kam also faced many daily crises with work. He had dealt with 9-11, 2008 Financial crisis, and Super Storm Sandy. With the stresses and pressures that he endured from family and work, he never once mentioned or complained about it. Knowing he was under all these pressures, I helped to alleviate some of his worries by managing all household finances from his income, care of our children, and anything that needed to be attended to at home. Unfortunately, that did not help tremendously. Instead, he took these stressors and did something mindless and this mindless act became an addiction unconsciously and hurt everyone we knew. It also changed our lives forever.

Through therapy, Kam has realized and acknowledged his wrong doing. He knows he has hurt his family, friends and colleagues and shows much remorse daily. Your Honor, I am here to ask for your leniency on his sentencing. Since this has been the very first time that Kam has been involved with the legal system, please consider giving him a chance to reestablish his connection to his family, his friends, our community and to make positive contribution to society and get the help he needs to address both his gambling and substance abuse addictions, in hope that he will one day again be a role model to our family and community.

Respectfully,

Ruby wong

SL 2

March 10, 2019

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Koeltl:

I am writing on behalf of my father, Kam Wong. I understand that he has been convicted of a crime and to say that I was completely surprised and deeply saddened by this fact is an understatement. For my entire life, I've only known my father to be a caring, thoughtful, and responsible man. I know that what he has done is a serious matter but I am hopeful that the court can recognize what I still believe, that my father is a good person who had become lost over a short period of his life, and made a life-changing mistake for which he will atone.

Over the course of my life, I've had many people that I've idolized and looked up to, but there has only been one true role model and hero that I aspired to become one day, and that person was my father. The impact he had on my life is immeasurable and I am the person I am today because of him.

I've often wondered why I would always have everything I wanted without a worry growing up when I knew my family didn't have much money. Over time, as I grew older, I realized this was because of my parents and what they did and sacrificed for the sake of my family. As a child, I never really got to spend much time with my father, though I knew he cared greatly about me and my brother. He was never around much because he was working so hard to try and improve our lives – leaving for work at 5am and returning home at 8pm every day for nearly 20 years. Coming from an impoverished family, he provided for us while never letting us know what a burden and hardship he was taking on. He never wanted us to worry. His goal was always to provide a better life for us than he himself had growing up, and in return, he sacrificed his own life and personal time with his family. I think over time, he became used to it, but looking back and seeing him over this past, very challenging year, I truly believe he realizes that one of his biggest regrets is not spending enough time with his family. His work ethic, his care and priority for his family, and his loyalty to those he believed were good people, are values that have been instilled upon me.

Despite not having a lot of spare time, my father was still always very dependable. There have been numerous times where I've had challenging moments in my life where I needed mentorship and advice to keep me on the "right track". I, like many teenagers, had a rebellious period where my relationship with my mother became quite strained. During this time, my father was always the calming voice of reason to help me understand that what my mother was doing or saying was for my own good. He helped me mature and be able to understand other's points of view.

During college, I had great career ambitions in business which largely came from watching my father; I wanted to be just like him, but even better. I was pursuing a very competitive field in investment banking and had interviewed at a number of investment banks during my junior year, but was not able to get any internship offers. Discouraged and on the verge of giving up, I remember vividly that I had a series of hours long conversations with my father about it during which he told me stories about the

SL 3

many times he had failed, and how people had looked down upon him over the course of his life but that he persevered through it all, believed in himself and believed that he would prove all of those people wrong. He made me believe that I could do the same and encouraged me not to give up on my goal. I followed his advice, tried again even harder the next year, and ended up getting the job opportunity I wanted. Fast forward 15 years, and I now have exactly the career to which I've always aspired.

These are only two examples out of many, where despite being as busy as he was, my father always made the necessary time. His patience and wisdom, in large part, helped propel me towards the life I have today – the beautiful wife and daughter, the close relationship I have with my parents, the successful career, etc. For that, I am truly grateful to my father as those are the aspects of my life that I appreciate the most today.

Lastly, for all that he taught me through his direct words and actions, I have also learned a lot from his life indirectly, including through this challenging time. I've learned that it's easy to get caught up in a career, yet we cannot forget about spending time with family and friends. I've learned that the stresses of life can sometimes be overwhelming and when it is, to not hold it all to yourself. I've learned to appreciate the "moments" in life and not to let those pass without truly appreciating them.

I know my father has done wrong during this portion of his life, but I truly believe this is an aberration driven by a sickness; I am glad he is taking steps to address his sickness and mental health by seeking therapy. I believe he now knows what he did was wrong, and that he is sorry and wants to atone. But I also believe that he still has a lot to give to this world, to share his story with others that may be in similar situations. Equally important to me, I believe he has a lot to give to his family, particularly my one year old daughter, his two other granddaughters, his two sons and his forgiving wife. For this, I beg Your Honor for leniency to allow him as much time as he can during the rest of his life to make up for all the lost years he spent trying to provide the best life possible for his family.

Respectfully,

Edward Wong

Hon. John G Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Koeltl:

I am writing to you on behalf of my father, Kam Wong. I acknowledge that my father has been convicted of a serious crime and will be appearing before you in court for sentencing. I am still working on the believing part. Growing up, children often view their parents in a god like manner, that they could do no wrong and their words, their beliefs and their ways were absolute. Having two children of my own (3 and 3 months), I can now see that this point of view is the furthest from the truth. We, as parents, are flawed. We're just trying to survive while figuring things out and sometimes we make mistakes. But do we ever let our children in on those mistakes? To let them know that we, in some way, have failed them? No. We do not.

May 8th, 2018... the first time I really saw the cracks in my fathers pristine persona. For the first time, he was as human as i was — with flaws, with emotion and especially with remorse. Prior to this, my father was my idol. He spoke with such grace, and wisdom whenever we were together. Nothing ever rattled him — nothing I ever did growing up as a child, not working 6 days a week to support us, not September 11th where he witnessed first hand a terrible tragedy only 500 feet away from his office windows, not losing his father and grandfather less than a month a part... nothing. His work ethic was second to none. His dedication to his family... second to none. There was never a question of how our family worked. My father would work, put everything he had into making sure my mother, my brother and I would never have a worry. Being a parent now, I understand the pressure it is to provide

**SL 5**

for your children, in any capacity; however, what my father did for me, and would do all over again in a heartbeat is truly inspirational to me.

My most fond childhood memories were always around my father. It was always simple, never extravagant memories — spending summer nights playing outside, waiting for the ice cream truck. On weekends heading into Flushing for brunch, and food shopping - my dad and I would always go to the fish markets, and aquariums together - apparently i used to like saying that fish in the tanks were "Big Fellas" — something, to this day, he doesn't let me forget.

The aquarium hobby is something he and I will always share. My dad kept koi in an aquarium in our house growing up. I would joke that they were my brothers and sisters. Every weekend, after we'd returned home from the aforementioned Flushing adventures, he and I would change into sweatpants and sweat shirts, shorts if it were summer and get right to work on doing his aquarium maintenance. I'd help hold the end of the tube aiming into a bucket while he was siphoning out the dirt and debris from the bottom. Every week we'd do this — until i was old enough to have aquariums of my own and when i did, he'd help me hold the end of the tubing into the bucket while I did most of the work. It was sort of a passing of the torch and something that, as simple as it sounds, will reside with me.

On December 5th, 2015 at 12:05pm, my first daughter, M▆▆▆▆ was born. Kam and Ruby's (My mother) first grandchild. Not too long after M▆▆▆▆ was born, my wife, Katie, was sleeping and recovering from labor, me, holding my new baby girl, sitting in the hospital rocking chair, lights were dimmed, as the sun was just starting to set — in walks my father and mother. "It's a girl," i say softly to not wake the newborn (My wife and I had decided to not find out the gender) - and the look on my Father's face was something I had never seen before. A mixture of joy, happiness, nervousness and relief. My dad always wanted a girl  and now, he finally had someone to play the role. What role you ask? The Spoilee, i like to put it.

**SL 6**

My daughter now, at three years old, has definitely assumed that role — boldly asking her 'Papa' to play legos with her, to take her to go see the fish in the basement, to get her a snack, etc. In all my life growing up, if you'd ask me if my dad had a soft side - it would've been a resounding and very sarcastic "HAH." But there it was/is. My dad now has not one, not two, but three grand daughters — something that he has fully embraced and so have they.

Since May, nothing has felt quite right. This whole ordeal has made me question myself, my values and my relationship with pretty much everyone. A lot of days i feel angry - for a variety of reasons. In moments, I am angry with my father; in others i pity him. I am angry with myself quite often — wishing I could've done more to help alleviate my dad of his demons. Many days i feel quite sad, thinking of what would've been had my Dad continued his career and ultimately gracefully exited. However, most days I feel quite hopeful. That may sound strange given the context of this whole scenario; but, believing in my faith of God, as well as my own abilities, i am truly hopeful that one day we can be as happy as we once were — that i can be as happy as i once was. Most of all, i am hopeful that this journey that my father is on will help him learn to deal with all of the pressures, and insecurities that plagued him. That he be surrounded by people who love and care for him, that support him and that want nothing more than to be with him.

Your Honor, I believe it is your duty to be just and fair in all that you do. I also believe that there are repercussions for every action — but please consider the toll of losing pretty much everything that he has ever worked for has already been taken, the loss of respect from an entire fixture of his life and that however you choose to deal with my father's sentencing, that you consider his wellbeing and his road to recovery. I do not believe my father is done contributing to this world. In his mind, and heart, contains a wealth of knowledge and care that can be shared with so many others, even aside from my own personal family. His generosity knows no bounds, and a work ethic — that takes a Hong Kong teenager, barely grasping a

**SL 7**

new language, working in and out of restaurants, going to school and university, receiving awards and accolades, receiving a masters degree, working 35 years in an establishment and rising to be it's leader… does not just goes away. My Father strayed from his path, please let us all collectively, including you, help him forge a new one, more meaningful and more fulfilling than the previous.

Sincerely, a concerned citizen, a father, a son…

Kevin Wong

March 10, 2019

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Koeltl:

I grew up always having had strict ideas of right and wrong, of what makes a person good or bad. It's one of the main reasons I am an almost religious viewer of true crime shows, as silly and frivolous as that may sound. I have always believed that criminals deserve to be punished to the fullest extent of the law; in fact, I often feel personally vindicated at the end of the show when the net finally closes over the guilty party. These shows allow and encourage me to view crime and punishment as black and white. As such, I have never felt more conflicted than when I was told my father-in-law had committed the crimes he did.

By my former definition and through the eyes of a random spectator perhaps, Kam's actions over the past several years cannot be excused. To that end, I don't think they should be. We should all be held to the consequences of our actions. However, learning and accepting these new facts about my father-in-law, who I love as I would my own parents, I realized that my previous feelings did not treat people, whether innocent or guilty, as humans. We often forget that to be human is to falter, stumble, and sometimes fall. Every person is full of nuance and complexities that most, including myself, simply refuse to try and understand. Now, I am forced to confront my own inherent prejudice because my father-in-law is one of the best people I've met.

The Kam I came to know over the last eight years is extremely stoic and serious, a man of few words. That is until you mention his family, at which point you realize he has an underlying silliness that would surprise many. He is a family man in the truest sense of the word; not only does he give all of himself to see his family happy, but he never expects anything in return. He is the hardest person to shop for during the holidays because he is content with the same worn down khakis and Rockport shoes he's had for years. He is the one who probably won't ask how you are doing, but will be the first in line should you ever need help. He is the one who used to text me at the beginning of every week during my difficult pregnancy to confirm my prenatal appointments and make sure I had transportation scheduled. He is now one of only three people, besides my husband and me, with whom my daughter will allow to hold her. I can see how deeply he loves his family even though he rarely expresses it in words. I can see that because I see so much of him in my husband and I am still endlessly proud of this fact.

At his core, Kam is a man of character who accomplished what few others were able to through hard work and drive, a man who unfortunately became engulfed in an addiction that slowly chipped away at the values that he had upheld his entire life. This in no way absolves him from the mistakes he's made, but I hope it will shed a little light on a dark chapter of a life otherwise filled with goodness. It is my deepest hope that Your Honor will have leniency so that my father-in-law can be reunited with the family who loves him.

Sincerely,

Shu Lin

Tin Yau Chiu



February 2, 2019

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Koeltl:

My name is Tin Yau Chiu and I am writing on behalf of my brother-in-law, Kam Wong. My wife, Virginia is his sister. I've known Kam for more than 30 years and before his conviction, I would describe him as the person who always stayed on the "straight and narrow".

Virginia and I lived with Kam and his wife Ruby when we had our first daughter. Ruby helped take care of our daughter when we went to work. During this time, I saw how hard Kam worked at his job and at home. I saw how devoted Kam is to his family and how he taught his two sons to be loving and considerate people. Kam is a good man and before his current situation, I would not have believed he was capable of such deceit.

Kam certainly understand he has done wrong as he has expressed great regrets and sorrows for his actions. The pain and suffering he has caused his family is evident every day. Kam is ready to accept his punishment because he knows the seriousness of the crime but I implore you for some compassion in his sentencing. Please give him a chance to make it up to the community and his family.

Thank you for your time and consideration.

Respectfully yours,

Tin Yau Chiu

Virginia Chiu

February 2, 2019

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Koeltl:

My name is Virginia Chiu and I am writing on behalf of my brother, Kam Wong, in hope that you will be sympathetic in considering his sentence. I have 5 brothers and Kam is the oldest. Being the only girl in the family, I can count on my brothers to always be there for me. Kam is nine years older than me so in some ways he was more like another parent figure to me instead of a playmate while growing up. He was the one that set good examples for the rest of us to follow.

Kam is a very hard worker. He always was. He would study harder and longer than any of us. He believed in hard work and not taking the easy way out. It was challenging for my family when we first immigrated to the USA. For Kam, that just meant working even harder. He worked full time and went to college full time. My brother is someone who understands responsibilities and taking the right path. This is why I can't even put into words how shocked I was to learn of what he has done.

I know my brother regrets his actions and feels great shame. He is very sorry for his wrongdoings. He would do anything to go back in time and make things right again. I pray that you will consider the man Kam was and give him a chance to be that person for his family again.

Thank you for your consideration.

Respectfully yours,

Virginia Chiu

**SL 11**

February 7th, 2019

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Dear Judge Koetl:

My name is Diana Loria. I am Kam Wong's sister-in-law. My sister Ruby is married to Kam Wong.

I met Kam when I was in high school. He and my sister were both enrolled in Bronx Community College. They met as part of the Asian Chinese community at the school. Even in these early days, I could tell that Kam was a sincere and impressionable person. He was attentive and friendly to his friends and strangers. Kam was the eldest of six children. When visiting his home, I could see that he was a responsible older brother and everyone in his family respected him.

Years later, I was married and had my son Caravaggio, who was two years old at the time. I had to travel overseas for work, and my husband was busy with his job. I asked my sister Ruby to be a caregiver for a few days. Kam picked up my son and drove him back and forth. He was very kind and treated Caravaggio like his own kid. Over the years, they both helped me and my husband many times in taking care of my two boys while I traveled for work.

When 9/11 happened, Kam's company was affected. The office building they were in was badly affected. Kam worked tirelessly day and night to keep the computers of the business running. Throughout the next two weeks he continuously made sure his office people had a place to work and that the teller machines were operating and giving service to customers. This is the Kam that I know. He was selfless and gave 100% to his job and company. He was proud of his good work and devoted to this company. I have seen him work about one hundred hours a week consistently to keep up with the demands of the job.

Lastly, I just want to share that Kam is a person looked up to by many people. Whether they are from the Chinese community or the workers at the job or his own

**SL 12**

friends and family, Kam always conducts himself as a generous, fair person. He is a natural leader and a good family man.

I hope that you will take into consideration his good attributes and understand that he has done so much to build this company Municipal Credit Union. He has worked tirelessly for this company for many, many years. Now his family needs him very much.

Respectfully,

Diana Loria

January 15, 2019

My name is Cecilia Moy Marin and I have known Kam Wong for over 40 years. I am his sister-in-law. I understand that he has been convicted of a crime and will be appearing before Judge Koeltl for sentencing. I hope that my words will be taken in consideration, and I appreciate the Judge's time spent reading my letter.

Kam has always shown a high level of decency during our relationship. His family and mine have always been very close. Our children are close in age which allowed us to spend lots of time together. I've observed his behaviors for 40 + years as being a loving father and husband, nurturing towards my son and compassionate towards my family. After my separation and eventual divorce, I was a single mother trying to properly raise my son. Kam helped my family many times when we were in need.

There was a time in my life where the financial burden of being a single mother began mounting. I was struggling to make ends meet. The mortgage and car payments became harder to make, while credit card debt started to pile up. I was concerned that I would lose our home. I was confiding in my sister, Kam's Wife, for moral support. As soon as Kam heard about the situation, he volunteered to step in and help my family out. This was such a surprise as I did not ask for help. He helped me through the toughest time in my life. He help me provide a stable home life for my son. I am forever grateful.

Another example of Kam Wong's good heart is his compassion for my son. Kam had offered to watch my son over the summer to take the burden of child care off of my shoulders. I know my son gained so much in life lessons during his time with Kam and his family. The following summer my son was staying with another family member. There was a falling out and they abruptly decided to not watch him anymore. I was in a panic for I had not made arrangement logistically or financially for childcare. Again, without me even asking, Kam came to the rescue and took my son in for the rest of that summer. Kam is a huge influence in my son's life. Since the separation, my son did not have a strong male role model in the house. I believe that Kam provided that role in his life. Without Kam's guidance my son would have had no support from a "Father Figure".

Kam Wong has been such a positive influence in my families life. He has displayed countless acts of goodness in our lives. I am truly and sincerely hopeful that Judge Koeltl can see that Kam is a very good man. I hope that the Judge may be lenient in the sentencing.

Sincerely

Cecilia Moy Marin

**SL 14**

February 7, 2019

Hon. John G. Koeltl

United States District Judge

Southern District of New York

40 Foley Square

New York, New York 10007

Dear Judge Koeltl:

I, Rosanna Moy, have known Kam as a good friend and my brother-in-law for over forty years.

I am aware that Kam has been convicted of a crime and will be appearing before Judge Koeltl for sentencing.

Kam helped me during my troubled divorce with mental and spiritual support. He provided a roof over my head in the late 80's, when I was going through a hard time in my life. He helped me find a job, during a time without financial stability. I have had independence and the ability to support myself ever since. He is a very caring person with his family, relatives, friends, and anyone who needs help and advices.

Kam has been selfless in his pursuit to pass on his knowledge and inspiration to better oneself. I've always known Kam as having very high ambition, a hard-working person who was an immigrant from Hong Kong. He worked at day and studied at night to receive his degrees; he also continues his education despite his level of success. More importantly he has given advices and influences on others, especially in the Asian Community. He has taken opportunities to guide them toward success in life. This shows his kind and compassionate personality, his is a good man with strong ethical values.

From all these years working under extreme pressure, Kam's health is not so good. He is nearing his retirement age, where he should be with his wife, two sons and three grand-children. More importantly he has never committed any malicious crimes or acts of indecency, besides the one being presented to the court.

I beg for the Judge Koeltl and the court to consider the good Kam has done in his life and consider leniency in the sentencing.

Rosanna Moy

Tina Szeto



February 9, 2019

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Koeltl:

I am writing on behalf of my brother-in-law, Kam Wong. My name is Tina Szeto and I am married to Kam's brother, Alan Wong. They are part of six siblings. Alan and I have been married for almost 36 years so I have known Kam and the Wong family for a very long time. During that time, I've come to appreciate the family's closeness, kindness and dependability, despite the many differences in personality and life experiences.

Kam is the oldest in his family and has always been very quiet and serious, especially compared with his siblings. I've come to realize that's very much to do with his being the first born in his family and always seen as the "leader" who looks after and takes care of all his family. At family dinners he has always been the 'quiet one' who listens and then offers guidance to family members to help them make good decisions on important issues for them. I think that is why we were all so surprised when we found out what Kam has done. Always "doing the right thing" is how I/we all know Kam.

Kam is very remorseful and ashamed that he broke the trust of the public and the pain he has caused his family. It is my sincere hope that you will consider Kam a worthy person despite his current situation and be lenient in his punishment. He is an honorable man who made some very serious mistakes which he greatly regrets. His family needs him and I know he will still be able to contribute to his community in a meaningful way.

Thank you for your consideration.

Respectfully yours,

Tina Szeto

Mun-Ting Tam

███████████████████

March 11, 2019

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

RE: Mr. Kam Wong Case

To The Honorable Judge Koeltl:

I am writing this letter with regards to Mr. Kam Wong's character. My name is Mun-Ting Tam, Kam Wong's sister-in-law. I know Mr. Wong over 40 years. During this time, he had shown to be a fine, trusted family member. He works hard, and is very dedicated to his job. As a reliable person, we know Kam Wong's offense was quite stunning.

Knowing in the past Kam Wong had contributed his time to youngsters in his community, Kam had motivated them for better education; lead them with opportunity in their career path. He listened and counseled them in life making decisions. I remember very well when I just finish school, finding a job was not easy without experience, he helped me search & set up interview which I am very thankful. Kam shares his experience as an immigrant, how he struggles to overcome in difficult times to success. He supports our neighborhood's new immigrants in many ways, helping them find jobs to settle down, helping translate for parents who had difficulty communicating with schools; several times he rushed bringing kids in the community for urgent medical care. Kam had encouraged and comforted many families in the past.

Kam Wong made a serious mistake, for which he is tremendously sorry. He will accept responsibility for his act. I know deep in my heart Kam Wong has every intention to self-improve, and will move past this mistake in a constructive manner. It's my hope that this letter regarding Mr. Kam Wong and his case will act as a positive and contributing factor when the court considers this matter.

Sincerely,

Mun-Ting Tam

SL 17

Alan Kam Fai Wong



February 9, 2019

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Koeltl:

I am writing on behalf of my brother, Kam Wong. My name is Alan Wong and Kam is my oldest brother. There are six of us. I have 3 other brothers and a sister. We are a very close family and always there for each other. Kam has been the brother we all looked to for guidance and what to do when there is a problem. It is an understatement to say that I was in disbelief and shock when I first learned of what he has done.

I have always known Kam to be honorable and trustworthy. He believes and have set examples for his siblings and children, that it is through hard work and doing the right thing can we be successful in life. Somewhere along the way, my brother lost his way. He made some very bad decisions but it is not who he is.

My brother is ashamed of what he has done. He knows what he did was wrong and realizes how much he has hurt everyone. I know Kam deeply regrets his actions and the pain he has caused his family especially his wife and sons. He has taken full responsibility of his actions and realizes he needs to make amends.

I hope you will be merciful in considering his sentence. He is a good man who has been a positive influence on many around him. If given the chance, he can continue to lead by example for his grandchildren and others. In spite of the current situation, I do believe my brother is an honorable man.

Thank you for taking the time to read my letter.

Respectfully yours,

Alan Kam Fai Wong

**SL 18**

**Kam Shing Wong**

February 28, 2019

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Koeltl:

My name is Kam Shing Wong and I am writing on behalf of my brother, Kam Hung Wong. Hung will be appearing before you on April 5 to find out his sentencing. I wanted to tell you a little bit about my brother and hope you will consider who he was and who I believe still is despite all that has happened.

Hung is my oldest brother and was always the most responsible and dependable of all our siblings. There are 6 of us and we grew up in a small one room apartment. My father worked long hours and my Mom stayed home to take care of us. Being the oldest, Hung had the most responsibilities. He had to help watch his younger brothers and sister and help out with chores. It was a lot for him but he understood his responsibilities. Even with so much to do, he never slacked off his schoolwork. Doing well at school was very important to him. He used to hide in the bathroom late at night so he can study. It was the only room in the house that had some privacy. Hung believed in hard work and encouraged us to do the same.

When we immigrated to the USA, Hung was just starting college. He went to school full-time and worked several jobs including waitering at a restaurant to help our family. That is what he does, work hard and take care of everyone. This is who he is - a caring and decent man. He taught his younger brothers and sister, as well as his two sons to do the same because that is what is right. Hung has been our family's pillar. He is a good man who got lost and made terrible mistakes. Perhaps it was the responsibility that has always been put upon him that finally got to him. It has been a very difficult time for our family. We have accepted what Hung has done but we are keeping it from our Mother. She is 83 years old and have been so proud of Hung. If she knew what he has done, it would break her mentally and physically.

I know Hung takes full responsibility for what he has done. What he did was wrong and he deeply regrets it and all the hurt he has caused. I pray that you will please be compassionate in considering his sentence. My brother is a good man who made a very big mistake. Please take into consideration the good he has done in the past and how he can contribute back to our community if given a chance. I pray also that my Mom can continue not knowing and be able to spend time with all her children.

Thank you for giving me the opportunity to share my thoughts.

Respectfully yours,

Kam Shing Wong

January 16, 2019


Karen Wong

████████████████

████████████████████

Re: Kam Wong


To: The Honorable Judge Koeltl

My name is Karen Wong and I am one of Kam's sister in laws.  I would like to take this opportunity to provide a perspective that shows Kam is more than the sum of the actions that leads us to this point.

I have known Kam for well over a decade having married his youngest brother. Growing up with five older siblings, my husband idolized his oldest brother. I often heard stories about trips to the beach and endless summers playing basketball until dusk. I heard stories about how Kam was an overprotective big brother who wouldn't let him play outside after school unless homework was completed and how he discouraged cartoons that he considered inappropriate on Saturday mornings. I heard stories about how he worked several jobs to put himself through college and how he worked long hours to provide for his two sons. Your honor, I heard many stories, but I also witnessed firsthand and can attest that Kam is hardworking, kind, generous, dependable and quick with a smile. He is always willing to help if needed and to provide valuable advice if requested. In addition, he is a favorite uncle to my ten-year-old daughter who always seems to know which pocket he keeps candy in.

Your honor, I respectfully ask you to please consider these factors. I understand the gravity of his offenses and misconduct; however, I am also aware that he is ready to accept responsibility for his actions, to seek counseling and to make amends. It is my sincere hope that the court takes this letter into consideration at the time of sentencing. Thank you.


Sincerely,

Karen Wong

February 26, 2019

Ming Wong

███████████████████

Re: Kam H. Wong

To: The Honorable Judge Koeltl

I am one of Kam's youngest brothers and am still having a hard time wrapping my head around the seriousness of his crime. It's been impossible to reconcile as this is not the person that I know. I don't think he ever had a parking ticket in his life which is why this has been so difficult to understand.

Kam is the oldest of my four brothers and the first person I would turn to if I needed help. He was there to break up fights between me and my brothers. He was there to help me with homework, and he helped me complete my college applications. It was very important to him as he was the first in my family to graduate college. He even accompanied me when it was time to register for my first college courses. Kam always stressed education and hard work. Education was always the answer and the way out of our one-bedroom apartment in Brooklyn. We really didn't have much as immigrants in a new country and when he wasn't at school or the library, he was at one of his many jobs to help my parents make ends meet. Even though he had so many responsibilities, he always found time for me. He would always let me tag along with him and his friends to the park to play. With a large family such as ours, Kam was almost like a parent. He would always be watching us and ensuring that we kept out of trouble. He would be the first person I would call when I had car trouble and he would be there in the middle of the night to pick me up.

I understand the gravity of his conviction including the trust that was broken; however, I believe that he is ready to accept responsibility and to make amends. Thank you for taking the time to read this and giving me the opportunity to respectfully request that you take into consideration these other factors during sentencing.

Sincerely,

Ming Wong

SL 21

Sau Kelly Wong



Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Dear Judge Koeltl,

My name is Sau Kelly Wong and I am Kam Wong's sister in law.  I am writing this letter on my own behalf as well as on behalf of my husband, Kam-Keung Wong; Kam Wong's brother.

We are saddened by the fact that Kam Wong has committed the crime he has been charged with.  We know he deeply regrets his actions.  While he cannot undo what he has done, we hope you understand that he has always been a good person.  All of his life, he has set a great example for others to follow.  Before this grave error in judgment, his past has been filled with triumphs brought about by his hard work and perseverance.  He was the first person in his family to graduate from college and rose through the ranks of his company by sheer hard work and dedication.  He has also always been there for his family.  When anyone in his family or any of his friends is in need, he is always the first to lend a helping hand.  We all witnessed the genuine care and kindness he has shown to people around him.

When Kam's father was diagnosed with cancer, Kam provided all the necessary care to him.  This included finding the right doctors, researching the recommended treatments, making arrangements for surgery and taking him to all the necessary follow-up visits.  It is typical of Kam to take on the responsibility to care for others.  He is truly someone we can count on.  We hope we have adequately described Kam as the decent person he is.

Kam suffers from an addiction which led to his current predicament.  Nothing he does now can change what he has done in the past.  However, we hope that you will take into his account his remorse for his actions and his willingness to take responsibility.  We ask that you render a lenient but just sentence in this matter.

Sincerely yours,

Sau Kelly Wong

Kam-Keung Wong

**SL 22**

January 20, 2019

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

RE: Kam Wong.

Dear Judge Koeltl:

My name is Adelante Yong, I'm writing on behalf of my first cousin Kam Wong, whom I've known since I was four years old when he, his five siblings and parents came to the United States. Kam is a hard working man, working as a waiter not long after arriving in the United States. Soon after, Kam enrolled into college and continued working. During many family functions he was not there, he was either working or in school. Kam embraced the opportunity of the American Dream by working hard at an entry level position at the Municipal Credit Union and working his way up the ranks to CEO of the Credit Union.

I am aware of Kam's legal troubles and will be appearing before Your Honor for sentencing. I am writing to offer a glimpse of Kam's care for family.

In November of 2017, I had lost my son, it was a stillbirth. Kam had just been promoted to CEO of MCU. Kam took the time out of his very busy schedule and went out of his way to visit me in the hospital the very same day. When I came home, Kam called me several times to convey his concern of my mental health and well being. Kam made sure I would speak with someone if I needed help. To me, Kam has a good heart and cares deeply for family.

**SL 23**

Kam understands that he has done wrong and expresses regret and remorse for his actions. I believe an extended prision term will serve as a hardship for his wife, children and new granddaughters. I am also concerned it will have a negative impact on his mental well being. I am hoping, Your Honor will be lenient in the sentencing of Kam Wong.

Thank you, Your Honor in advance for your help and for taking the time out of Your Honor's busy schedule to read my letter.

Respectfully yours,
Adelaide Wong.

SL 24

January 16, 2019

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Koeltl:

I am writing on behalf of my cousin, Kam Wong.  I met him in the early 70's when my aunt, uncle and their children emigrated to the US from Hong Kong.  I was attending elementary school in NYC while living in Chinatown with my parents and siblings. I vividly remember how excited I was to have my cousins living so close and getting to know them.

Growing up, most of my summers and weekends throughout the years were spent in their apartment in the Midwood   section of Brooklyn. Kam, clearly from the first moment I met him, was looked up to by his entire family. He was the oldest of 6 siblings.  There was huge responsibility left on Kam to care for his mother and younger siblings, while his father was working night, day and weekends in a restaurant to support the family. Kam made sure there was no fighting, homework and chores were done, and constantly reminding me and my cousins to stay out of trouble. He always took a moment to impart onto me small life lessons, even when he was deep into his studies full time and working part time in the restaurant business as a busboy or dish washer.  During the early 80s in Chinatown, I was surrounded by many people in school who joined gangs. It was very common at the time, especially growing up poor to seek social acceptance and want to be a part of a larger "family" who had money, clothes and offered protection. But never did I waiver having been cared for and looked after by Kam. He was always reminding me to stay away from that environment and keep focused on school. I'll always remember those conversations and am grateful to him. It's memorable because he was the only one that gave me that kind of talk. I look up to him, coming from another country, assimilating into the US, learning a new language, having strong family values and hard work ethic, he was my role model. I listened to Kam. In the end, I chose correctly because of his influence. I am now a retired Sergeant from the New York City Police Department after 22 years of service. I am also happily married to my wife Tiphanie, of 11 years and a most proud father of my 10 year old daughter, G███. He is to me, an older brother I never had. Kam has and will always make me proud. I've used him many times as the perfect example of how to succeed in life by studying hard/ working hard. He is living proof that the American Dream exists for those who are willing to strive to achieve it. I also believe that he has so much to contribute to society with his story, especially during these current times when immigrants are facing so many hurdles.

**SL 25**

Since hearing about Kam and the charges brought against him, I sincerely want to say that I am still in complete shock. I understand that he is currently convicted of a crime and will be appearing before you for sentencing. So I've come to accept that my cousin Kam has somehow developed this insidious gambling addiction, a serious brain disease. I wholeheartedly want to support him by any means necessary for his complete rehabilitation. At this period of time in his life, I will be praying that he receives help to overcome this mental disease so he can be back with his wife and growing family. I hope that your honor, will see that Kam is genuinely an admirable man who took an uncontrollable wrong turn in recent years only to feed his mental disease from gambling. I pray that his healing would come mostly from seeking treatment and being full time with his family as soon as your leniency allows.

Respectfully,
Gregory Gong

February 23, 2019

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Koeltl:

I am writing to you in regards to Kam Hung Wong.  Kam is my family by marriage. I met Kam in 2005 when my husband and I were dating seriously. Kam and his wife, Ruby, were his first family members I was introduced to. My husband, Greg, felt it was important for me to meet his cousin, Kam, because he respected Kam so fully and held him in high regards. Greg wanted to get Kam's approval. Kam was more than just a cousin, the word cousin feels distant, Greg felt like they were brothers.  Greg grew up with Kam and Kam's siblings when his family immigrated to the US in the early 70s. Kam was a positive influence over Greg's childhood. He was always a hard worker, wanting to make something of himself. He didn't want to just work in a restaurant, most immigrants made their living in the restaurant business, he wanted to get an American education and make something of himself to take care of his parents and siblings. Greg knew early on in his childhood, he had to go to school and get a great education. It was instilled in him through Kam. Greg saw him work nights and weekends but also keep up with his studies. It was through determination, hard work and resilience that Kam worked his way up the career ladder and was promoted to CEO of MCU. The entire family, immediate and extended was so proud of Kam's achievements. It was the American Dream every immigrant coming to America hopes for.  Kam's success was earned because of his work ethics. He is a man who is fair.  He offered help when help was needed. Greg is a retired NYPD sergeant. I am a stay at home mother to our 10 year old daughter. We regard our family very close to our hearts. We teach our daughter that working hard in school will lead to success in life. Lessons that were imparted to Greg via Kam are also passed down to our daughter.

For so long, Kam was so immersed in his work, which I can't imagine doesn't come with high stress and unseen challenges. Kam made some very wrong decisions. I truly believe he was not in a right state of mind when he made these poor choices. If anyone in the family knew what was going on, we would have without a doubt step in to get help. Addiction, whether it is to a substance or in this instance, gambling is a very real mental problem. I plead with Your Honor that you give Kam the opportunity to work on his mental health. I hope that your sentencing will be lenient. Kam truly is a good person. He means so much to our family. His wife, children, grandchildren, nieces and extended family want what is best for him and need him.


Respectfully,

Tiphanie Gong

SL 27

**Honorable John G. Koeltl**
**United States District Judge**
**Southern District of New York**
**40 Foley Square**
**New York, New York 10007**

Dear Judge Koeltl,

I am writing this letter on behalf of my cousin, Kam Wong, who is before you on an embezzlement plea.

Kam was one of the few individuals I looked up to growing up and for great reasons. He is the eldest of 6 siblings and immigrated to the U.S. (from China) when he was in his late teens. Through sheer determination and drive, he was the first person in my family to graduate from college. He worked numerous back-breaking jobs to provide for his parents and siblings while completing his studies.

Kam's professional career epitomizes the very best of what this country has to offer. He climbed the corporate ladder from an accounting clerk all the way to the CEO of a New York credit union. He was not afforded the benefits of connections, an Ivy-League degree or mentors. He accomplished it through his work ethic, working long hours for ~40 years while being a devoted husband and raising 2 wonderful boys (they're in their 30s now but to me, they will always be "the boys"). The 2 men, Ed and Kevin, have since produced 3 amazing grandchildren.

It would be an understatement to say that I was shocked and dismayed over his charges. He has always been a law-abiding citizen and to my knowledge, he has never skirted the law outside of perhaps a speeding ticket (if that).

This illness of his (gambling addiction) clearly clouded any semblance of good judgement and I pray he gets the help he needs. I know it's no excuse but sometimes it can get lonely at the top and my guess is he was probably looking for some diversion away from everyone. Unfortunately, this diversion morphed into a full-blown addiction (with the merchants clearly enabling him).

Your Honor, I am seeking the mercy of the Court when you decide what punishment my cousin should receive for his actions. He needs to be held accountable and pay restitutions but he is a good man, husband and father who suffered a terrible disease. He is absolutely no threat to society. I hope that you will be sympathetic for his uncharacteristic behavior and be lenient, allowing Kam (now in his 60s) to spend the final stage of his life with his grandchildren.

Thank you for your time and consideration.


Kindest Regards,

Ernest Gong

████████████

January 10, 2019

**SL 28**

March 12, 2019

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Koeltl,

My name is Melissa Chiu. I am writing you this letter concerning my uncle, Kam Wong. Kam is my mother's oldest brother.

I can say with confidence that he is remorseful and regretful of his actions and wrongdoings. This was extremely difficult for my entire family. We were in shock and words were just not coming together.

My memories of him when I was younger are very fond. He would always take my younger sister and I out to eat. I would always remember getting so happy when we were aware he was coming to pick us up. I remember going on a family vacation with my uncle. This was one of the best times of my life. He is so humble, down to earth and would never turn his back on you.

Judge Koeltl, I am asking you take my letter into account and to be lenient on my uncle when you sentence him. I am hoping that we will see clearer skies after this storm. He is the main character in our family!

Respectfully,

Melissa Chiu

**SL 29**

Ashley Chung



February 15, 2019

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Honorable Judge Koeltl,

I am writing on behalf of Kam Wong who is appearing before your court in April. I am Kam Wong's niece hence have known him all my life.  I was shocked to hear about his case, as it was very much out of character for the man that I grew up knowing. He has never been anything but kind, thoughtful and generous towards my family and me.

At first, I struggled to understand how such a hardworking, successful, self-made man was able to commit the crimes he is being charged with. But the more I learned, the more I began to understand how much my Uncle was struggling with addiction. Addiction is such a terrible disease and while it in no way excuses the actions of people who suffer from it, it does provide context as to how good people can sometimes lose their way. I provide this letter understanding the charges made against Kam Wong but felt compelled to speak on his behalf and let you know about the goodness I have seen my Uncle demonstrate over much of my life.

My Uncle has long been a patriarch of our entire family.  He has always gone above and beyond to take care of our large family.  Personally, he has given me invaluable career advice, helped me in my professional life, and overall readiness for a career in corporate finance.  It seemed important to him to help me succeed and I feel indebted to him for the guidance and advice he's given me.

I hope this letter can provide a reference as to the good character of my Uncle. Our family and I all know that my Uncle is ready to accept responsibility for his actions but also ask for some leniency at sentencing.

Sincerely,

Ashley Chung

SL 30

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Koeltl:

My name is Caravaggio Loria, and I am writing on behalf of my uncle, Kam Wong - or as I have always known him, uncle Stanley. He has been a part of my life since my earliest childhood memories. I understand that my uncle has plead guilty to committing a crime and is awaiting sentencing.

When I was very young, my parents worked long hours, and often left me in the care of my uncle. Some of my fondest early memories are with him, as well as my aunt Ruby and my two cousins, Kevin, and Edward. We always ate dinner together, and he was always encouraging me to try new foods. We would watch basketball and movies on the TV. One of my very earliest memories -- I was perhaps 3 or 4 -- is of my uncle bathing me and teaching me how to say different body parts in Cantonese. At the end of each of my visits, it was usually my uncle who would drive me home, which was an hour-long trip in each direction. I know these things are small and simple, but those things meant the world to me, when I was young. I truly think that at heart, Kam knows how to appreciate these simple things: family, duty, and love.

Today, I only see him when we have large family gatherings. But, when I do see him, I am always reminded of a man who welcomed me into his home as his own child. I am concerned for him, and his family. I hope that you will consider giving him a minimal sentence. I know that when he has served his sentence, he will be able to come back to his family, and society as a whole, and contribute in a positive way. Hopefully, that time will come sooner rather than later.


Thank you,

Caravaggio Loria

February 7th, 2019

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Koeltl:

My name is Gavriel Loria, and I am writing on behalf of my uncle, Kam Wong, whom I have known since before I can remember. I recognize that Kam has been convicted of a crime and will be appearing before you for sentencing.

I want you to know that he has always been extremely dedicated to his work — checking his phone and taking business calls at all odd hours — but that he never let his work get in the way of spending time with and investing in his family and his community. He has always been a gracious host at our large family dinners, always taking the time to invite in, engage with, listen to, and keep in touch with hundreds of family and friends over the years. In fact, I am still in awe thinking about how he has strengthened the bonds of our extended family, and how he cared about the lives of so many people over many decades.

Furthermore, when I was sixteen years old (in 2010), I decided to bicycle across the United States (Oregon to New York City) to raise awareness and funds for the charity Autism Speaks. He thoroughly supported my crazy endeavor, and donated to the cause. I am still grateful for his generosity.

I am worried about Kam. From my time with him over 25 years, I understand him to be a good man, husband, father, and grandfather. I sincerely hope you will consider sentencing him with leniency.

Respectfully,

Gavriel Loria

SL 32

January 15, 2019

My name is Andrew Moy Marin, and I am Kam Wong's nephew. I understand that he has been convicted of a crime and will be appearing in court for sentencing. I truly appreciate Judge Koeltl's time and consideration of my letter.

I have known Kam my entire life. He has always been the shining example of moral and ethical direction. My parents separated when I was very young. My mother, Kam's Sister in Law, and I spent quite a bit of time with their family. They have 2 sons, my cousins, which were close enough in age to me that we grew up together and formed life long bonds. Observing Kam as I grew up, I knew him as a Family man who was compassionate, caring and very hard working.

There was one summer in my memory where Kam showed how much of a good person he is to me. I was 14 years old and staying with another family member in New Jersey for the summer. My mother was a single parent and usually welcomed help from the family during the summer so she could work and feel confident that I was being cared for. I was a going through a rebellious teenage phase and had been acting up while staying with the other family member. After an argument they decided to kick me out, which put my mother in a compromised position concerning her plans for childcare. Kam heard through the family about the events taking place, and without hesitation got in his car and drove to New Jersey. He welcomed me into his home for the rest of the summer to ensure that my mother could feel at ease. He did not care that I had a recent reputation of being hard to deal with. His main concern was helping our family. This has been the character of Kam Wong as long as I've known him.

Later in my college years Kam had come to my aide once again, proving how decent of a man he is. I was in my 4th year at the University of Central Florida. I had not been doing well in school, and found myself financially unable to support myself. In addition to this situation, I had just found out that my girlfriend and I were going to have a baby. I felt like my life was collapsing. Creditors were calling and threatening me on a daily basis, and I had exhausted my finances and could not pay for rent or books. At this time of need I found myself calling Kam for help. He has always been a father like figure to me, and he was the only person I trusted to understand my situation. In the manner consistent with the good person I've always know him to be, he helped me without hesitation. With his help and guidance I was able to get back on my feet. After changing schools I graduated Magna Cum Laude from Johnson and Wales University in 2005. Since then I have had a successful career and an amazing family life with my wife and 3 children. None of this would have been possible if Kam was not such an amazing individual.

**SL 33**

Kam Wong has always been my example of how to live life as a good and decent person. His compassion towards my mother and I have made such a positive impact on our lives. Kam Wong has done so many positive things in his life. Now, I pray for Kam and his family and hope that Judge Koeltl finds it in his heart to be lenient in the sentencing.

Sincerely,

Andrew Marin

Evelyn Wah

███████████████

███████████████████

██████████████

January 13, 2019

Re: Mr. Kam Wong

To the Honorable Judge Koeltl:

I am writing on behalf of Kam Wong, who is appearing before your court.

Kam Wong is my uncle and I have known him for over 40 years. I was surprised to learn that my uncle has been convicted of a crime, as he has had such a positive impact on my life and the lives of many others.  However, I understand the seriousness of the matter and hope the court will show my uncle some leniency.

My Uncle Kam has positively influenced me and taught me valuable lessons in a number of ways.  Since I was very young, Uncle Kam would teach us the importance of education. He would support and encourage me and others to study well in school. Uncle Kam could also be counted on to help us if needed and celebrate our wins with us. In addition, Uncle Kam taught us the value of learning through work. He showed me how I could take what I learned in school and extend that learning through part-time jobs and summer internships. He would support me by providing job advice or giving me a ride to work when needed. Finally, Uncle Kam demonstrated the importance of hard work through his own example. He was committed to the members at Municipal Credit Union throughout his career, frequently working well into the night and on weekends.  His work ethic and sense of responsibility towards his company, team and constituents strongly resonated with me and continues to influence me today.

My Uncle Kam cares very deeply about people. He would frequently check in on his team, see how they were doing and made sure they were doing well. He knew when his teams' family members were ill and inquired about their health. I was always surprised by how many people he knew and kept track, in terms of their well-being.

My Uncle Kam also cares about his family and makes a point to regularly connect with them despite his heavy workload and schedule.  He prioritizes time with his family, including his three amazing granddaughters.  He also carves out time for extended family. Despite

**SL 35**

living in California now, he still checks in on the well-being of me and my family. He does this because he cares about people and his family.

It is my sincere hope that the court takes this letter into consideration at the time of sentencing and show my uncle some leniency for the positive impact he has made in my life and the lives of others.


Sincerely,


Evelyn Wah

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007


Dear Judge Koeltl:


I am writing on behalf of my family friend, Kam Wong.

I have known Kam and his family for approximately 5 years. We met through mutual friends, and I have spent enough one on one time with them to form my opinion with resect to his character. We have spent quite a few dinners together along with assisting him with his house repairs.

Overall, Kam is a devote husband and father. He truly loves and his family and has always be there to provide for them. His son is a shining example of how good of a dad he's been over the years. I say his because his son is a decent honest hard working person. Traits you don't learn on the streets or in school. These are the traits you learn at home from your dad. I can say this as I have worked side by side with his son repairing his home. During which time, you get to see what someone is made of and how they handle themselves. You get to talk to them and discuss their points of view on a variety of topics and ideas. His responses and insights were very honorable and forthright. I know if either of my sons were to handle themselves in the same way, I would be very proud of them. That's why I feel that his son is indication of hi good nature and character.

I never got to work with Kam, but my son did via an intern program sponsored by his company. The experience he gained there really help ground him and helped open his eyes by having a real, hands-on job. For Max, it was not just a summer internship but exposure to some qualified role models. Kam stood out in particular. Kam would attend my son's departmental meetings and provide feedback and insights. Something most CEO's don't share with subordinates, never mind interns.

While there Max got to see just how hard everyone works and just how many hours, Kam had to put in to run the company. His example of hard work and determination showed Max how hard work pays off. I can only say thanks and praise for the experience Max gained while working under Kam.

Kam has told me about his current legal situation and that he is up for sentencing in the near future. All I can say is overall, Kam is a good man. I can only hope that you find it appropriate to show Kam leniency with respect to his sentencing.

Sincerely,

Kenneth Gallagher

**SL 37**

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Koeltl:

I am writing on behalf of my family friend, Kam Wong.

I was fortunate to have worked with Mr. Wong at Municipal Credit Union over the course of two summers in 2016 and 2017. I worked in the loan operations department as a Summer Intern both years. I say I was fortunate, as the experience I gained from working there helped guide me in my career path. Prior to working there I was feeling a little lost and working at MCU helped guide me with a real world working environment.

My skills were utilized by various areas in the department and it was all because Mr. Wong took a chance on me. The intern spots were very few and there were tons of kids applying. Prior to working there, like most high school graduates, I had very little working experience. Once I started we had regular meeting which Mr. Wong would sit in on. He as always pointing out things and providing guidance on how to handle our issues. After a short time my team was showing great progress and I feel it was all due to Mr. Wong's advice and guidance.

I understand from my father that Mr. Wong is in a lot of trouble and will be seeing a Judge Koeltl for sentencing soon. I do not know all the particulars, but from what I do know it does not sound like the same man who I worked with. Mr. Wong was a strong leader and was always talking about doing the right thing for the company. He was someone I looked up to.

While I worked there, we were always cross checking one another, to make sure we had everything just right and accounted for. How Mr. Wong could have done something so bad, and for so long without anyone noticing or speaking up I find very weird. But I do not know all the facts. All I know is the Mr. Wong I worked with is a good man. He was always working hard and set a strong role model for me.

I do not know how the sentencing works, but if you can please show leniency with Mr. Wong, I am sure no one will regret it.

Respectfully,

Maxmillan Gallagher

Maxmillan Gallagher

# Joseph Lyden



January 30, 2019

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Koeltl,

My name is Joseph Lyden. I am a physicist by training (PhD from Columbia, BS from Cooper Union), have done research in industrial and academic labs, and taught Physics, mathematics, English, and citizenship classes in various capacities, and have spent a number of decades designing and implementing computer and application systems and communication networks worldwide.

I have known Kam (and Ruby) Wong  for about five years.

Kam clearly is a devoted father and grandfather.  He has supported and encouraged his children, and was extremely affectionate and generous in his interactions with his grandchildren at the family celebrations that I have attended.

Kam is an extremely hard working professional. He worked his way up from an entry level office worker to CEO at MCU and has significantly enabled MCU to grow dramatically.

An example of his hard work that I observed him in a small local restaurant. I went there to eat with my wife late one night and there was Kam at a table alone except for two computers he was working on while handling a work conference call.

I also know that he often would work late at the office to meet deadlines for the benefit of MCU.

Unfortunately, Kam suffers from a serious gambling disease that has led to bad actions that now threaten his personal, family and professional life.

Kam is facing his demon and admitting his weaknesses and is seeking professional help.

I am convinced Kam is sincere in his realization of the truth and his commitment to overcome this gambling compulsion. If he is given the chance to pursue this course of action, I feel confident that he will apply his great energy and capabilities to recover successfully and use that energy and capabilities to be a positive force for his family, friends and the community.

Judge Kotlel, I hope that you also see Kam's desire to make amends and to become once again a positive force for good in his family, with his friends and in the community.

Thank you very much for your time and consideration.

Sincerely yours,

Joseph Lyden

**Ivy Lyden**

January 20, 2019

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Koeltl,

My name is Ivy Lyden, and I am a teacher for middle school students, helping them with
the SHSAT examination. I was also a research chemist working under contracts for
NASA and the Department of Energy.

I have known Kam Wong through his wife as a friend for over six years. He is only known
to me as the most generous and compassionate individual. When I mentioned that my
sixteen year old nephew was agonizing over choosing his major and the right college for
himself, Kam has taken time out from his heavy workload and spent numerous hours of
mentoring and guiding my nephew in choosing a major that suits my nephew's passion,
and he is doing great in college. Even though Kam had major deadlines that week and
facing tremendous responsibilities and pressures at his company.

Through his hard work and stewardship MCU has grown much under his leadership. He
always told me that his employees are the reasons for this success. Therefore, he provided
them with the best health benefits.

 Kam is also a very loyal person. He has never forgotten his old friends in the restaurant
in which he used to be a waiter. He frequented those tiny hole in the wall restaurants to
remind himself where he came from. He often lend money to poor friends in need
knowing very well he would not be paid back.

Kam has now realized that he has had a serious gambling disease and is undergoing
professional treatment. I know many Chinese people have the same disease, some have
lost everything, including their family, while some have completely reformed and have
became productive citizens in our society. With continued therapy treatment, I know my
friend Kam will use his strength as a compassionate leader to benefit and better our
community.

I am pleading to you Judge Kotlel, that you might give Kam Wong a second chance to do good and contribute to our society.

I sincerely thank you for reading my letter.

Sincerely yours,

Ivy Lyden

January 31, 2019

To Whom It May Concern,

My name is Charles Rodriguez and my wife is named Shirley. I am a retired police officer from Arizona after serving 27 years, my wife is a retired mortgage processor after working at it for over 35 years. We are friends and have known Kam Wong for approximately 10 years. I understand that he has been convicted of a serious crime and is awaiting sentencing. I have arrested many subjects that have committed all types of crimes in my career as a police officer. I am hoping that leniency can be granted to Mister Kam Wong.

I have several reasons to request leniency. Kam does not have a criminal record. This is his first offense. He has tried to make up for what he has done. In the 10 years that I have known him, I remember two times when he found out about a family in Hong Kong who was in desperate need of help in someway, and Kam came to the rescue. He assisted those families until they were able to get back on their feet and he never requested or asked for anything in return. These families were not related to him at all. On another situation, another family in Chinatown in New York City, were going to be evicted because the father had lost his job and was unable to make the rent, and again Kam came to the rescue after he found out about the incident. He did not know the family or have any relations with them, But again he helped them out until they were able to make it on their own. Again he did not asked for anything in return.

This is the Kam I know. When ever my wife and I visit New York City, he was always there to greet us and make us feel welcomed and safe, which meant allot to us, because many people find New York City to be very intimidating. Kam's home was always opened to us.

I would like to end this letter with a situation that I was involved with when I was a police officer. I had to arrest a high school football coach here in Arizona, due to the fact that he had stolen over $600,000 from the high school sports program over a 30 year career. The coach had a gambling problem. Even though the coach committed this crime, he was always there to assist his players and their families in their hour of need. The judge took the coach's caring nature, this being his only crime that he was ever convicted of, and the coach's willingness to make things right and the judge placed him on probation, had him do community service, and made him go through counseling sessions for his gambling problem.

I do not feel that Kam Wong should be removed from society and incarcerated. What the judge gave the coach should be sufficient for Kam. Kam is a good person and he will make things right. The embarrassment and shame that he is feeling right now, will help him be a better person.

Thank you for your time.

Respectfully,

Charles Rodriguez

February 10, 2019

**Re: Sentencing of Kam Wong**

Dear Judge Koeltl,

I am a Tax Accountant who has known Kam Wong ("Kam" or "Mr. Wong") since I was a child growing up alongside his children in Valley Stream. Although I understand that Mr. Wong has been convicted of a crime, I am still in disbelief.

My cousins and I are first generation Americans and the elders in my family cannot speak English. This was an obstacle for us living in Valley Stream since there would be emergencies that needed immediate attention but we were not able to communicate it to the appropriate authorities. Luckily, Kam and his wife lived a block away and were a great help to us. One situation that comes to mind is when the pipes burst in our house and my family had no idea what to do. We had no idea who to call or where to even start. Mr. Wong came immediately, assessed the situation and called the plumbers. This is only one example of many where Kam came to our immediate assistance.

Kam has always been a great help to my family and we are always grateful for all that he has done for us. With this, I hope that you, the Honorable Judge Koeltl will be lenient with Kam's sentencing. I appreciate your time and consideration.

Best regards,

Melissa Suen

**SL 44**

HEMMINGS LCSW COUNSELING PC
430 W Merrick Road
Suite 16
Valley Stream NY, 11580
917-553-4662

February 24, 2019

Honorable John G Koeltl
United State District Judge
Southern District of New York
40 Foley Square
New york, New York 10007

RE: Kam Wong

Dear Judge Koeltl:

My name is veronica Hemmings, a psychotherapist.  I am writing this letter on
behalf of my client Mr. Kam Wong whom I have been working with since May of
2018. He is receiving individual therapy to address his gambling addiction as well as
the circumstance that contributed to this problem.  This is an OASAS approved
program ran by the New York State Counsel on Problem Gambling.  Mr. Wong meets
the DSM-V diagnosis criteria for Pathological Gambling.  Mr. Wong has been
compliant with treatment to date and is actively engaged in the process.

I am aware that Mr. Wong is charged with grand larceny and is schedule to be
sentenced in April 2019.  The purpose of this letter is to tell you about my
experience with my client.  Mr. Wong is a family man who is very remorseful of the
crimes he has committed.  He has lost the respect of his employer, his colleagues, his
community as well as his family.  Mr. Wong is very aware of the impact his addiction
has had on his business community and his family.  He is cognizant of the fact that
he deserves to be punished for the crimes; however, I am asking for leniency
because despite his addiction he has contributed significantly to our society and
have made a positive difference in many people lives.

One of his goals is to educate individuals about the disease of addiction as a way of
bringing awareness to a problem that has gotten very little attention to date.  Base
on my experience with Mr. Wong I ask that the totality of his life and contribution to
society be weighed heavily.  I recommend that you give careful consideration to the
above information before making a final decision about his future.

Respectfully,

Veronica Hemmings LCSW-R, CASAC

March 1, 2019

Hon. John G. Koeltl
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re:     Kam Wong

Dear Judge Koeltl:

I am writing this letter on behalf of a colleague and friend, Mr. Kam Wong and I thank you for taking the time to read this and all letters received on Kam's behalf.

My name is Scott Meyer.  I am a father of 5 children, a husband (married for 30 years to my high school sweetheart), a respected community member, a project manager at a Long Island based manufacturer, a former CPA and Financial advisor, a friend, uncle, godfather and also a gambling addict in recovery since July 12, 2013.

I had the distinct pleasure of being introduced to Mr. Wong through my recovery where I was asked to meet with Mr. Wong on a weekly basis to share my experiences and assist him in understanding a horrible disease – problem gambling.  I have been meeting with Mr. Wong since May, 2018.  I have come to know Kam as a humble man who succumbed to an illness that is far more serious than anyone is willing to admit.

As I mentioned above, I am a "former" CPA and Financial Advisor.   As a result of a severe gambling problem, I destroyed my family's financial security, lost my dignity and respect, attempted to take my life 3 times, lost my professional licenses, my career and future earning capacity and I lost my freedom. Your Honor, I went to prison for my actions.  Only through dedicated love, I did not lose my wife and children.  They were all willing to seek an understanding and educate themselves about the gambling addiction.  They were willing to do this because they could not believe that their "hero" could do such unthinkable acts of dis-trust.  I too, took money that did not belong to me, not out of greed or a desire to enhance my life – every dollar I earned, saved was lost in gambling.  You will never hear that gambling is an excuse for any of my actions, it is only a reason.

I trust that you will be receiving significant testimony relating to the disease of gambling so I will not address it, but am completely willing to if you so desire.

Your Honor, I spend a lot of my time that I am not working, advocating for change for the gambling addict.  I speak at local colleges, sponsor members of GA, have substantial writings in front of legislators

**SL 46**

to advocate for more treatment programs in the prison systems, alternatives to incarceration, recognition of the disease under the ADA (Americans Disability Act) and others.

Honorable Koeltl, you will have Mr. Wong before you for sentencing for crimes committed that I am very familiar with.  Mr. Wong has taken accountability for his actions.   Sentencing Mr. Wong to a lengthy prison will be punitive only.  It will take away a resource for the gambling addict advocacy programs that exists.  Mr. Wong has an ability to speak, as I do and I implore you to think about the positive impact 1 man can have on an epidemic -problem gambling.  As the governments look to balance budgets and increase revenue, gambling access increases exponentially.   Support systems, awareness advocacy programs, treatment programs and education of our children are imperative.  Any type of prison sentence will take away from Mr. Wong being able to earn money and repay the remaining portion of his restitution.

Mr. Wong should be held accountable for his actions, yet I hope and pray that you could offer another solution – maybe mandating to serve in Gambling addiction related programs.  He would be an incredible asset to our cause.

I have begun working with OASAS to develop an educational awareness program across NYS and will soon be speaking in local communities throughout the state of New York.

Thank you for your time.  I am available at your convenience should you need any clarification or additional information.

Respectfully,

*Scott Meyer*

Scott Meyer

# APPENDIX B

Last Name - WONG

# NET WORTH STATEMENT

NOTE: I = Individual    J = Joint    S = Spouse/Significant Other    D = Dependent

## ASSETS

**BANK ACCOUNTS** (Include all personal and business checking and savings accounts, credit unions, money markets, certificates of deposit, IRA and KEOGH accounts, ROTH IRA's, Thrift Savings, 401K, etc.)

**Section A**

| I/J S/D | Name of Institution | Address | Type of Account | Account Number | Personal or Commercial | Balance |
|---|---|---|---|---|---|---|
| | | PlEASE REFER TO ATTACHED 2 PAGES | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**SECURITIES** (Include all stocks in public corporations, stocks in businesses you own or have an interest in, bonds, mutual funds, U.S. Government securities, etc.)

**Section B**

| I/J S/D | Name and Kind of Security | Location of Security | Number of Units | Fair Market Value |
|---|---|---|---|---|
| I | A/C # _____ -2599 | WELLS FARGO ADVISORS | | *15,744 |
| I | A/C # ____ -6877 | WELLS FARGO ADVISORS | | *105,430 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**MONEY OWED TO YOU BY OTHERS** (Include all money owed to you by any person or entity.)

**Section C**

| I/J S/D | Name and Address of Debtor | Amount Owed to You | Reason Owed to You | Date Money Loaned | Relationship to Debtor (if any) | Monthly Payment or Date Full Payment Expected | Is Debt Collectible ? |
|---|---|---|---|---|---|---|---|
| | | | NONE | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Initials _____    Date _____

Last Name: Wong

Section A: Bank Accounts /CD / 401 (K) Plan

(J) Chase Bank         654 Franklin Ave         Checking
                       Franklin Square, NY 11010       7041   Personal   $3,113.85

                                                Savings
                                                       8174   Personal   $472,530.13

(J) HSBC Bank          682 Dogwood Ave.         Checking
                       Franklin Square, N.Y. 11010      837   Personal   $1,921.39

                                                Savings
                                                       569   Personal   $408,409.46

(J) Bank of American   300 Merrick Road         Checking
                       Lynbrook, N.Y. 11563            0104   Personal   $500.00

                                                Savings
                                                       5766   Personal   $247,873.72

                                                CD              Personal   $159,099.10

(J) Sterling National Bank  711 Franklin Ave.   Savings
                       Franklin Square, N.Y. 11010    0247   Personal   $4,974.21

                                                CD              Personal   $8,478.97

(I) Ascensus                                    401 (K) Plan   Personal   $461,608.22

Last Name: Wong

Section A: Bank Accounts / CD / 401 (K) Plan

(S) Sterling National Bank   711 Franklin Ave.
                              Franklin Square, N.Y. 11010

Checking
████████8378   Personal   $1,926.04

Savings
████████7833   Personal   $26,132.03

CD
████████9696   Personal   $36,943.57

(S) HSBC      682 Dogwood Ave.
              Franklin Square, N.Y. 11010

Savings
████████3580   Personal   $38,925.96

Savings
████████-888   Personal   $4,087.88

(S) Municipal Credit Union   1660 Hempstead Tpke
                             Elmont, N.Y. 11003

Savings
████████59      Personal   $3,856.39

(S) TD Bank   275 W. Merrick Road
              Valley Stream, N.Y. 11580

Checking
████████5768   Personal   $40,791.92

Savings
████████5385   Personal   $641,113.26

# APPENDIX C

BARRY ROSENFELD, PH.D., A.B.P.P.
CLINICAL PSYCHOLOGIST
NYS LICENSE 012049

875 WEST END AVENUE
SUITE #1-B
NEW YORK, NY 10025
TEL: 212-721-2745
ROSENFELD@FORDHAM.EDU

DEPT. OF PSYCHOLOGY
FORDHAM UNIVERSITY
BRONX, NY 10458
TEL: 718-817-3794
FAX: 718-817-3699

September 3, 2018

## Confidential Psychological Evaluation

Re:   **Kam Wong**
      **U.S. v. Kam Wong**
      **18 Mag. 3876**
      **Date of Birth:** November 21, 1955
      **Evaluation Date:** August 7 and 30, 2018

Kam Wong was referred for a psychological evaluation by his attorney, Jeffrey Einhorn. Specifically, Mr. Einhorn requested an evaluation of Mr. Wong's current psychological functioning, and the extent to which any mental disorder(s) may have impacted his actions in the alleged instant offense. Prior to the evaluation. Mr. Wong was informed of the limits of confidentiality in this context. Specifically, Mr. Wong was informed that the results of this evaluation would be provided to his attorney and may, if requested, be summarized in a written report that could be submitted to the court and the U.S. Attorney's office. As such, no information disclosed in the context of this evaluation could be considered confidential. Mr. Wong appeared to understand the lack of confidentiality in this evaluation and agreed to participate in the evaluation.

**Evaluator:** Barry Rosenfeld, Ph.D.

### Sources of Information:

1. Clinical interview with Kam Wong, conducted by Barry Rosenfeld, Ph.D., August 7 and August 30, 2018
2. Psychological testing with Kam Wong, conducted by Barry Rosenfeld, Ph.D., August, 2018
3. Interview with Ruby Wong, conducted by Barry Rosenfeld, Ph.D., August 30, 2018
4. Telephone interview with Veronica Hemmings, L.C.S.W., conducted by Barry Rosenfeld, Ph.D., August 30, 2018
5. Forensic Psychological Evaluation, signed by L. Thomas Kucharski, Ph.D., dated May 30, 2018
6. Sealed Complaint, 18 Mag 3876, dated May 7, 2018

**Overview/Legal History:** According to the sealed complaint, Mr. Wong was arrested in May of 2018 and charged with embezzlement from a credit union, defrauding a financial institution, wire

Kam Wong cont.
U.S. v. Kam Wong
18 Mag. 3876
p. 2

fraud and aggravated identity theft. These charges reportedly resulted from Mr. Wong's position as Chief Executive Officer and President of the Municipal Credit Union. Specifically, Mr. Wong is alleged to have received payments in excess of four hundred thousand dollars in reimbursement for allegedly fraudulent dental expenses and received more than three million dollars for retroactive disability insurance payments that were never purchased. A number of additional allegations are set forth in the Sealed Complaint, for much smaller sums of money, that was requested by Mr. Wong, reportedly based on misrepresentations.

**Relevant Background Information:** Mr. Wong reported having been born and raised in Hong Kong, the oldest of six children born to Payhai and Sang Wong. He described growing up in "a very poor family" and recalled frequently being "hungry as a child." He noted that his father worked as a mason while his mother, who he described as "rebellious", was a homemaker. He stated that his grandparents, aunts and uncles all moved to the U.S. when he was a young child, but his parents and their children (he and his siblings) remained in Hong Kong for several more years, in part due to his mother's difficult relationship with her parents. He added that his relationship with his siblings has always been somewhat strained, in part because he often served as the disciplinarian for his younger siblings. He recalled that his family eventually moved to the U.S. when he was 19 years old, and has remained there ever since. He noted that he met his wife (Ruby) shortly after moving to the U.S., and they married three years later, when he was 23 years old. He noted that they have two adult sons, now 29 and 36 years old, and described close relationships with his wife and children. He denied any history of marital problems.

Mr. Wong stated that he "was not a good student in high school" and recalled having skipped school occasionally to socialize with his peers. Despite reportedly failing some subjects, he recalled having "excelled in English" and had no difficulty finding a good job as a clerk for an import-export business. He stated that he eventually agreed to move to the U.S. with his parents and siblings after his grandfather promised to pay for his college education. He stated that he initially attended Bronx Community College (where he met his wife), obtaining his Associate's degree in Business in 1979, and subsequently attended Baruch College where he obtained his Bachelor's degree in Business Administration and Accounting in 1981. He added that he worked in a restaurant and lived at home until he was approximately 25 years old, eventually moving into an apartment shortly before he graduated college. After he and his wife married (in 1981), they reportedly moved into their own home. He noted that he began working for the Municipal Credit Union in the fall of 1981, initially as a staff accountant. He stated that he was promoted to Assistant Controller in 1986, and became Chief Financial Officer in 1989, and CEO in 2007. He described himself as "driven" in his job, and explained that the company grew substantially under his leadership ("the company grew from 60 million to 2.8 billion from my marketing campaign"). However, he also described a corresponding increase in the stress associated with his work, particularly after the September 11, 2001, terrorist attack.

Mr. Wong denied any history of mental health treatment prior to his arrest for the instant offense, but when asked about past periods in which he should have sought mental health treatment, Mr. Wong described his traumatic experiences during the September 11th terrorist attacks. He explained that he watched the incident from his office, in a high rise building just blocks away from the World Trade Center. He recalled having witnessed the second plane hit the tower, and

Case 1:18-cr-00737-JGK   Document 42   Filed 05/13/19   Page 84 of 87

Kam Wong cont.
U.S. v. Kam Wong
18 Mag. 3876
p. 3

observed people falling or jumping from the towers. He stated that he had nightmares and difficulty sleeping in the days that followed the episode, but felt compelled to continue working due to his position of responsibility within the Credit Union. However, he stated that while he arranged for mental health counseling for his staff, many of whom had also witnessed the attacks alongside him, he did not participate in the counseling program. He explained "I have this feeling I'm a leader – if I get help, I look weak." He noted that he was sent to see a psychiatrist and a psychotherapist by the pretrial services officer and has seen these clinicians for the past several months. In a telephone interview with the undersigned examiner, Mr. Wong's psychotherapist, Veronica Hemmings, LCSW, noted that she has seen him regularly for the past 3 months, both in individual sessions and in a small, 2-person group. She explained that she thought he would benefit from being in treatment with another person with a similar background, and cited social isolation as a primary source of concern for Mr. Wong. She denied having any observed severe symptoms, but noted "I think there is some depression and anxiety."

Mr. Wong also denied ever having had serious medical problems but recalled having sought medical care for the stomach problems that arose in the months following September 11th. He explained that he began experiencing stomach pain and sought medical consultation repeatedly, but no doctors were able to identify a physiological cause for his stomach problems. He stated that these symptoms have eased over the years, though he continues to have stomach discomfort on a regular basis. He denied having any other significant medical problems, but noted that he suffers from allergies that require over-the-counter medication. He also recalled having broken his kneecap in 2001, when he slipped on a curb that required surgery and treatment with analgesic medication for several weeks. He denied any history of excessive alcohol use or ever using illegal drugs, noting that he only drank to the point of intoxication once, as a teenager, and has never used any illegal drugs.

**Mental Status Examination:** Mr. Wong, a short, thin, middle-aged Asian man, arrived for evaluation well-dressed and neatly groomed, wearing a blue blazer and dress shoes He was cooperative and easily engaged in the evaluation, and he made regular eye contact with the undersigned examiner. His speech was normal in rate, tone and volume, and his thought processes were logical and relevant, with no evidence of disordered thinking or referential ideation. He described his mood as "very remorseful" and reported feeling depressed much of the time. His affect was generally constricted, but at times became tearful when discussing his legal situation and the shame accompanying his legal difficulties. He stated that he cries frequently since his arrest and has difficulty falling asleep because he is preoccupied with his legal difficulties. He also reported diminished appetite, noting that he has lost approximately 10 pounds (despite having been always been thin), and has begun taking a dietary supplement to try and regain some of the weight he has lost (he estimated that his current weight is only 107 pounds). He added that he has lost interest in many of the activities he previously found pleasurable (i.e., anhedonia), and currently spends much of his time sitting on the couch watching movies on his iPad. He also reported increased anxiety ("heart pounding" that has worsened since his arrest (which he characterized as "traumatic"), stating "I jump every time I get [telephone] calls." However, he acknowledged that he has experienced some chronic symptoms of anxiety in addition to these recent symptoms. For example, he stated that he has always felt compelled to look above him whenever he is walking on the street, and explained that

Case 1:18-cr-00737-JGK   Document 42   Filed 05/13/19   Page 85 of 87

Kam Wong cont.
U.S. v. Kam Wong
18 Mag. 3876
p. 4

as a child he once witnessed a body falling from a tall building. Despite reporting heart palpitations and chronic stomach problems (reportedly beginning after the September 11th terrorist attacks), he denied other symptoms of intense anxiety (i.e., panic attacks), such as shortness of breath, and sweating. He described intrusive thoughts, but these centered primarily on his fixation with the lottery, stating that he often has dreams that his "numbers coming out" (i.e., that he has missed an opportunity to win money). He added that he occasionally still has dreams about the September 11th attacks, but denied any residual symptoms related to this traumatic experience. He reported having had occasional thoughts of suicide after his arrest, and reportedly acknowledged these feelings to his wife and adult sons. He stated that he contemplated taking "a whole bunch of pills", but added that he subsequently threw away the pills he had, characterizing these thoughts as "selfish." He denied any history of auditory or visual hallucinations, and denied anger or irritability. He revealed no evidence of paranoid ideation or bizarre, unrealistic beliefs (i.e., delusions). He was alert and oriented to person, place and time, and his memory, concentration and abstract reasoning abilities were grossly intact. His overall intellectual functioning appeared above average and his insight and judgment were fair.

## Results of Psychological Testing:

Tests Used:

Minnesota Multiphasic Personality Inventory, Revised-Restructured Form (MMPI-2-RF)

Psychological testing with the MMPI-2-RF generated a valid, interpretable profile. There was no evidence of deliberate symptom exaggeration, nor any indication of confusion or random responding, although Mr. Wong appears to rely on denial as a means of coping with distress. Thus, his responses to the MMPI-2-RF may underestimate the true extent of his psychological problems, as he appears to have limited insight into his behavior. This limited insight is evident in the pattern of his responses, as Mr. Wong endorsed a number of indicators of severe psychological distress such as feelings of hopelessness, suicidal ideation, social avoidance, and gastro-intestinal distress. However, he did not endorse many of the more explicit symptoms of depression or anxiety, suggesting that his distress is likely to emerge in more subtle indicators that he may not identify as psychological in nature. Despite these indicators of distress, Mr. Wong revealed no evidence of more serious behavioral problems such as impulsive or antisocial behaviors, nor a propensity toward substance abuse. Nevertheless, individuals with this personality style are often poor candidates for psychotherapeutic interventions, as they tend to lack insight and externalize the source of their distress.

**Account of the Offense:** Mr. Wong recalled that he first began playing the New York State lottery in 2001, initially purchasing one or two $1 "Pick 4" tickets each week. However, he recalled playing more often after the September 11th terrorist attacks, when his company was forced to move buildings and their new location had a convenience store nearby. He estimated that he initially began purchasing a few tickets every day, spending $10-20 per week, and characterized his behavior as a hobby. However, his gambling reportedly increased substantially after his promotion to CEO, spending approximately $100 per day in 2007 and 2008, despite characterized this level of spending as "controllable" during the present evaluation. He noted that he always played the same set of 10 different numbers, purchasing multiple tickets for each of these numbers. He acknowledged the irrationality of his behavior, noting the contrast between

his gambling and the conservative approach he took to his management of the Municipal Credit Union. He explained precisely how poor his chances of even breaking even were with the lottery, despite his continued and gradually increasing expenditures. He stated "it just feels so good when I win" and added "I'm afraid the day I don't play, the number comes out." He recalled having nightmares in which his lottery number won, yet he had not played the number for that day. He stated that he withheld knowledge of his gambling from his wife by having his annual bonus divided into two separate checks, one that he gave to his wife and another that he used for gambling. He recalled that his spending – and his losses – increased dramatically after he renegotiated his contract in 2015, arranging for his employer to provide him with supplemental payments to account for disability benefits that had not been paid, yet were part of his compensation package. However, he acknowledged having spent all of this money on lottery tickets, and estimated that he lost more than 3 million dollars between 2015 and 2017. He cited this behavior as primarily a means of coping with the stress associated with his job, noting that "I don't have any hobbies – I don't know sports," and described some of the challenges that he had to face as CEO of the Credit Union. He recalled having repeatedly tried to stop gambling ("I told myself to quit so many times"), but was only able to refrain from this daily habit when he traveled to Hong Kong with his family – and even during those periods he recalled having occasionally telephoned the convenience stores where he purchased tickets, placing orders for thousands of dollars' worth of tickets.

**Clinical Formulation:** Given his history, there is little doubt that Mr. Wong's suffers from a severe gambling disorder (DSM-5 312.31), an addictive mental disorder characterized by the persistent and recurrent problematic gambling. In Mr. Wong's case, these symptoms appear to have begun as a means of coping with the stressors associated with his rapid promotion to Chief Financial Officer, which occurred in his early 30's (in what was essentially his first "real" job). Although he stated that his gambling worsened after the September 11th terrorist attacks, he attributed this increase to coincidence, as there was a convenience store that sold lottery tickets in the building where his office had relocated. Although this may be factually correct, it appears far more likely that Mr. Wong's lottery fixation became his primary coping strategy, serving as both a social outlet (spending large amounts of time at the lotto store on the weekends) and a means of distracting him from the stressors associated with his work (e.g., managing a small financial organization through multiple challenges, including as the financial collapse of 2008 and the effects of the 2012 "Hurricane Sandy"). Given the volume of time and money spent by Mr. Wong in the several years leading up to his arrest, there is little doubt that he had lost control over his addiction to gambling, particularly given his awareness of the odds of winning money through this form of lottery, with daily winnings that are limited in the amount available.

In addition to a severe, and steadily worsening gambling addiction (for which he is now in treatment), Mr. Wong appears to have developed a major depressive disorder (moderate, single episode; DSM-5 296.22) following his arrest for the instant offense. He described sleep and appetite disturbance (including a substantial weight loss), feelings of guilt and shame, a lack of energy or interest in pleasurable activities (i.e., anhedonia), and occasional thoughts of suicide. Although some of these symptoms have been identified by his current psychotherapist, this therapist does not appear to have recognized the extent of his depressive symptoms, nor recommended consultation with a psychiatrist for possible psychotropic medication (which, in

Kam Wong cont.
U.S. v. Kam Wong
18 Mag. 3876
p. 6

this evaluator's opinion, should be considered). Of note, Mr. Wong's wife, Ruby, confirmed many of these depressive symptoms, noting the marked change in her husband's demeanor in the months since his arrest.

Mr. Wong also noted that he has had a worsening of the anxiety symptoms, some of which he has experienced throughout his lifetime. He described longstanding avoidance behaviors associated with having witnessed a body falling from a tall building as a child (i.e., looking up as he walks in the street; a behavior that was also confirmed by his wife), and reportedly developed gastrointestinal problems in the months following the September 11th terrorist attacks, along with occasional nightmares related this trauma. His gastrointestinal symptoms, which appear to have been psychogenic in origin (based on the inability of multiple specialists to identify an organic etiology for his symptoms), have reportedly waned somewhat over the years, corresponding to the rise in his fixation on playing the daily lottery. However, he described the more recent onset of additional anxiety symptoms, such as "jumping" whenever the phone rings (i.e., hypervigilance), along with intrusive thoughts about the lottery. Although these symptoms do not appear to satisfy the specific criteria required for a diagnosis of posttraumatic stress disorder, they are nevertheless indicative of a chronic trauma-related disorder (i.e., other specified trauma-and stressor-related disorder; DSM-5 309.89) that has been shaped (and worsened) by the occasional traumatic events he has experienced.

**Summary/Conclusions:** Mr. Wong described a history of experiencing several traumatic events, coupled with steadily increasing work-related pressures that coincided with his worsening gambling addiction. Although he sought medical treatment for some of the symptoms that appear to have been associated with his traumatic experiences (i.e., chronic stomach problems following September 11th), he apparently "managed" these stressors through a fixation on gambling that became increasingly obsessive in the years leading up to his arrest. Moreover, Mr. Wong described (and his wife's report substantiates) the emergence of multiple depressive symptoms, although these symptoms have not been the focus of his current psychotherapy, which has focused almost exclusively on his gambling addiction. Referral for cognitive-behavioral therapy focused on his chronic trauma-related symptoms and more recent depressive disorder is strongly recommended, as is consultation with a psychiatrist regarding the appropriateness of antidepressant medication. In addition, while his current treatment provider has not yet arranged for Mr. Wong to participate in Gamblers Anonymous, this group-based intervention would likely bolster his efforts to avoid renewed gambling. Given the nature of his gambling addiction, and the absence of any prior criminal behavior, impulse control deficits, or personality disorder symptoms, the likelihood of reoffending or future criminal behavior appears very low.

Barry Rosenfeld, Ph.D., A.B.P.P
Licensed Clinical Psychologist
Diplomate (Forensic), American Board of Professional Psychology